PROVOSTY, J.
The present suit is by the stockholders of the defendant company, a corporation domiciled in New Orleans, to set aside, as unauthorized and fraudulent, a sale made by the president of the company to F. A. Glover and wife of a certain so-called “lease” which the company held on the land ■of the same F. A. Glover and wife,, situated in the parish of Washington; also to set aside a sale made thereafter by F. A. Glover and wife of the same land to the defendant Le Sassier, as having been made in pursuance of the same alleged fraudulent scheme to defraud the defendant company; also to set aside, on the same ground, a mortgage executed by Le Sassier on the land in question in favor of the defendant Landry.
The lower court sustained plaintiff’s demand, and Le Sassier alone has appealed.
The so-called lease in question gave to the defendant company the right to operate a sand and gravel pit on the land in question for 49 years in consideration of a royalty -of one cent per cubic yard of material removed from the land. Though made to the defendant company, it was entered into before the defendant company had' come into existence. It was executed on April 6, 1909; and the charter of the defendant company was not signed until April 19, 1909, 13 days later. This discrepancy, however, has not given rise to any question in the case. After the lease had been obtained, the person who had obtained it, one Johnson, set about organizing the defendant corporation. The incorporators were himself and two others, Calhoun and McGampbell. Johnson was made president; McCampbell, treasurer; and Calhoun, secretary. The three constituted the first board of directors, to hold office until the first Monday of April, 1910. The corporation was capitalized at $20,000, divided into 40 shares of $500 each. Subsequently nine of these shares were issued to the plaintiffs, and fully paid. This was all the capital the company ever had. The incorporators themselves never contributed one cent. They, or perhaps it would be more accurate to say Johnson, managed the affairs of the company. The company had an office in New Orleans. Johnson, for the company, made a show of going about establishing a plant for operating the gravel pit. He bought some tools and mules and lumber, and constructed a barge, and began the construction of a spur track to the nearest railroad, and ordered machinery. What amount of money was invested in these tools, mules, lumber, and barge, the record does not show. Very little work had been done on the spur track by the time the company had reached the stage of being, in the words of its president, “down and out.” This was in the latter part of June, 1909, two months after the signing of the charter. Calhoun had resigned and retired. One Newman had been elected in his place, but, apparently, had never consented to serve. Two thousand dollars had been borrowed from the Metropolitan Bank, and $2,392 of debts created in addition. The company had not a dollar in its treasury. The clerk in charge of the office had never been paid one cent of his salary. The workmen employed on the spur track had quit work because unpaid. The shareholders then began to take an interest. One *897 of them, Mr. Settoon, and a Mr. Ooleman conceived the idea of buying out the stockholders; and Mr. Chappuis, an accountant, was employed to go over the books of the company and make a report. He found t'hat the directors had fraudulently voted themselves $3,786 of the money of the company, as well as large salaries; that there were many debit entries on the books not supported by any vouchers; that one entry which should have been $50 was $508; that shares of stock were outstanding for which no payment had ever been made; that the books had been kept in the loosest and most unbusinesslike manner. On receiving this report, Mr. Settoon sounded the alarm ; in other words, he mailed a circular to the stockholders advising them that, “if they wished to save anything from the wreck in which the company was involved, prompt action was necessary,” and calling upon them to meet at the office of the company “for the purpose of discussing the affairs and deciding what we can do and how to do it.” The meeting took place, and, if any conclusion at all was arrived at, it was that nothing could be done, except perhaps to sell out to Messrs. Coleman and Settoon. Things remained in that condition, nothing doing, and, apparently, nothing proposed being done, except to sell out to Messrs. Coleman and Settoon, until on or about July 16, 1909, when Johnson proposed to Le Sassier that the latter buy the land from Glover, as his (Johnson’s) company was “down and out.” Le Sassier made an inspection of the land and decided to buy it, and made arrangements with a Mr. Wm. Hannah to furnish him the capital with which to establish a plant and operate the sand and gravel pit. On July 28, 1909, Mr. Le Sassier went to Franklinton, the parish seat of Washington parish, to pass the act of sale of the property, reaching there late in the evening. He found that, on the day previous, the 27th of July, the lease to the defendant company had been recorded, and that it operated ás an incumbrance on the land. Johnson had had this done. In view of this incumbrance, Le Sassier declined to buy the land, and upbraided Johnson for bringing him to Franklinton on a fruitless mission. He returned to New Orleans the next morning, July 29th. During that day, Johnson and MeCampbell, who composed the directorate of the company, and under the charter constituted a quorum for doing business, met at Franklinton, and adopted a resolution authorizing Johnson to make to Glover and wife the sale now sought to be set aside, and the sale was accordingly made that day, and the inscription of the lease canceled from the records. The price of the sale was $500. Johnson then wrote to Le Sassier informing him of what had been done, and advising him that he, Mr. Glover, and Mr. Le Sassier’s attorney, Mr. Gayer, were coming to New Orleans on the next day, July 30th, to pass the act of sale, and asking him to meet them on the arrival of the train. Accordingly, in the evening of July 30th, the persons just named, together with MeCampbell, met at the St. Charles Hotel, in New Orleans, and a resolution authorizing the sale to Glover and wife was entered into the minute book of the defendant company and duly signed by Johnson and McCampbell, and the act of sale between Glover and wife and Le Sassier was passed; the price being $1,000. Le Sassier, on the next day, executed the mortgage in question in favor of Landry for $20,000. Landry was a clerk in the notary’s office, and accepted the mortgage merely as a matter of form; the object being to create mortgage paper to be pledged to Hannah as security for the $16,-000 to be advanced by him to Le Sassier for purchasing the gravel pit and establishing a plant for operating it. The mortgage notes were pledged to Hannah. He has not been made a party to this suit. Mr. Coleman em *899 ployed one Martinez to examine the gravel pit, and report on its value; and Martinez, as a witness in the case, testified that in his opinion the value was about $1,000.
Le Sassier and Glover knew nothing of the plan to sell out to Coleman and Settoon. The record leaves no doubt that they acted in perfect good faith. It leaves also no doubt that Johnson was a mere chevalier d’industrie, and that his obtaining this lease and organizing the defendant company-was nothing more, so far as he was concerned, than a mere scheme for doing what he eventually did — get all the money he could lay his hands on by selling the stock of the corporation and borrowing money in its name and then leaving for parts unknown. So far as known, he is now in jail in Canada.
Glover had become aware that Johnson had obtained the lease from him by misrepresentation; that, whereas Johnson had represented that he had $18,000 with which to establish a plant and operate the sand and gravel pit, and within 60 days would be moving 1,000 cubic yards a day, and paying $10 a day royalty, he was in fact, a mere impecunious adventurer. And Glover, upon learning of the penniless condition of Johnson and his company, had consulted his attorney, and been advised that the contract with the company could be easily set aside, it having been obtained by misrepresentation; and had decided to bring a suit for that purpose.
All the evidence as to these misrepresentations of Johnson and as to Glover’s having consulted an attorney and been advised of the infirmity of the company’s contract and of his intending to bring suit was objected to by plaintiffs on the ground that it tended to contradict and vary the terms of the contract by which Glover purchased this lease from the company.
We think the evidence was clearly admissible for the purpose of repelling the imputations of fraud which the plaintiffs are casting upon this sale. Glover testifies that this sale to him was in the nature of a compromise; he thinking that his paying $500 to free his property of this lease would be cheaper than a lawsuit.
The sale by Glover to Le Sassier was brought about by Johnson. It was he who, as already stated, proposed it to Le Sassier.. In like manner, he approached Glover, told him that his company was “broke,” but that he knew a man who would pay him $1,000 for the land, and in addition give him and his son employment at $75 per month.
The two sales in question — that of the company to Glover of the contract, and that of Glover to Le Sassier of the land — were-genuine transactions. The prices, $500 in the one instance, and $1,000 in the other,, were duly paid. They were in good faith.
Rut this good faith will not defeat plaintiff's action, if, as contended, the sale was. unauthorized. The reasons why it is said not to have been authorized are: First, that the resolution of July 28th, purporting to authorize it, was adopted at Franklinton, away from the domicile of the company, and was therefore void under section 741, Rev. St.;, second, that the board of directors was without power to sell this contract, which was the main asset of the defendant company and indispensable to it for carrying on its. business.
[1] The resolution adopted at Franklinton, on the 29,th under which the sale was made,, was, undoubtedly, of no effect, for the reason stated; but the renewal of this resolution in New Orleans on the 30th, and the-formal entering and signing of it on the minutes, can be viewed in no other light than of a ratification of the previous action of the board of directors at Franklinton. The company, through its president, had received $200 of the $500 from Glover, and was expecting to receive the balance of the $500-out of the $1000, which Le Sassier was to pay to Glover. And, instead of offering t& *901 return the $200, or declining to receive the $300, it adopted, and duly entered on the minutes, the said resolution, and thereafter received the $300. This amounted, clearly, to a ratification of the act of the directors in passing the resolution of the 29th at Franklinton. That the unauthorized acts of the officers of a corporation may he thus ratified, see 10 Cyc. 1068 et seq.
The question of whether the making of this sale was beyond the powers of the board of directors must be determined by reference to the charter of the company, and the state of t'he company’s affairs at the time it was made. Article 3 of the charter reads:
“The objects and purposes for which this corporation is formed and the nature of the business to be carried on by it are declared to be, to buy, and deal in gravel, sand and building materials of all descriptions, and to build and erect buildings, and improvements in general.”.
It is thus seen that the exploiting of this sand and gravel pit, or the carrying out of the contract in question, was not the sole purpose and object of the organization of the corporation. There were other objects and purposes.
[2] And the evidence leaves no doubt that at the time this sale was made there was no longer any question of the company’s going on with the business of carrying out this contract, but only of the stockholders trying to “get something out of the wreck.” The injury to the plaintiffs was not that their company was put out of business, for, in the expressive language of their president, their company was already “down and out”; but it was that it was Johnson, and not they, who “got something out of the wreck.” After all has been said, the only thing of which the defendant company has been deprived by the transaction of which plaintiffs complain is a lease upon a tract of land which Martinez valued at $1,000 and which Glover, its owner was willing to sell, and did sell, for $1,000; a lease, by the way, which may be said to have been obtained without valuable consideration, since the promises upon which it was obtained were never kept, and never intended to be kept, we believe, at the time they were made. The value of the land, or of the lease upon it, is not to be judged from the $16,000 loan agreed to be made to Le Sassier upon the security of the mortgage given upon the land; for that was to rest not alone upon the land, but also upon the plant to be established upon it by the expenditure of the $16,000.
As against the defendant Le Sassier, the judgment appealed from is set aside, and the suit of plaintiffs is dismissed, at their costs.
SOMMERVILLE, J., takes no part herein.