PONDER, Justice.
After listening to the arguments advanced herein, a study of the briefs in support of the appeal, and a review of the record in the case, we have arrived at the conclusion that the trial judge in his written opinion has correctly stated the facts and applied the law applicable to the case and, therefore, we have decided to adopt the opinion of the trial judge as the opinion of this Court, which is as follows:
“These are suits brought by six corporations, all allegedly owned or controlled by Ted Dunham, against the defendant, O. R. Stephens, to annul and set aside a royalty agreement between Anderson-Dunham Concrete Company, Inc., and the said O. R. Stephens and to recover certain royalty payments which have already been made to the said defendant.
*221 “The plaintiffs are Dunham Stephens Gravel Company, Inc., (originally chartered under the name LaSalle Materials Company, Inc.) and five of its creditors who contend that the royalty agreement in question and the payments already made to the defendant constitute an unlawful distribution of assets by the corporation DunhamStephens Gravel Company, Inc. to the defendant, O. R. Stephens, one of its share holders and directors.
“There is not a great deal of controversy in this case regarding the facts, but it is necessary to go into some detail in setting them forth. Prior to the year 1949 the defendant, 0. R. Stephens, who has been for many years engaged in the business of buying and selling sand, gravel, clay and other building materials, was the sole owner and had exclusive control of LaSalle Materials Company, Inc., a corporation engaged in the business of mining, buying and selling sand, clay, gravel, stone, etc. At some time prior to the year 1949, LaSalle Materials Company, Inc., leased from Louisiana Development Company a pit dr quarry located near Winnfield, Louisiana. This lease provided for a royalty of 5¡4 per ton on all sand, clay, stone, gypsum, etc. removed from the land. LaSalle Materials Company, Inc., which was owned and controlled by the defendant, O. R. Stephens, operated this quarry for some time.
“On May 31, 1949 LaSalle Materials Company, Inc., entered into a contract with Anderson-Dunham Concrete Company, Inc. whereby Anderson-Dunham Concrete Company agreed to buy certain materials produced by LaSalle from the quarry it had under lease near Winnfield. Then on October 25, 1949 LaSalle Materials •Company, Inc. entered into an agreement with Anderson-Dunham Concrete Company, Inc,, whereby Anderson-Dunham took over the entire operation of LaSalle Materials Company, Inc. at the quarry near Winnfield. In this agreement LaSalle subleased the quarry to Anderson-Dunham and granted them an option for one year to purchase the lease and all equipment and machines used in connection with the operation.
On March 2, 1950 Anderson-Dunham exercised its option and paid to LaSalle the sum of $56,750 for the sub-lease and all equipment and machinery used in connection with this particular quarry. This sublease also contained the provision that LaSalle would receive royalty of 10^ per ton on all sand, clay, stone, etc., the arrangement being, of course, that out of this 10(4 per ton, LaSalle would pay to the land owner, Louisiana Development Company, 5^ per ton and LaSalle would retain'the remaining 5(5 per ton as a profit. This 5¡4 per ton which was to be retained by LaSalle Materials *223 Company, Inc., is the royalty which is the subject matter of this litigation.
“By 1950 LaSalle had become heavily involved financially to the extent that all of its assets were mortgaged and the defendant had even pledged his life insurance to secure the indebtedness. Apparently the defendant realized that he would have to bring new capital into the company in order to save it and he began to try to interest various parties in such a proposition.
“During the early part of 1950 the defendant began to negotiate with Mr. Ted Dunham regarding the investment of new capital in the LaSalle Materials Company Inc. The defendant’s version of these negotiations between himself and Mr. Dun-ham is that after discussing the matter several times it was thoroughly understood and agreed that Mr. Dunham would pay off all the indebtedness of the LaSalle Materials Company Inc., and that he would receive a controlling 2/z interest in the stock of the corporation and that Mr. Stephens would receive the remaining 1/3 interest in the stock and he would also receive the royalty of 5‡ per ton on all sand, gravel, clay, stone, etc. removed and sold from the Winnfield quarry. Mr. Dunham was to have complete control of the corporation and Stephens agreed to remain in its employ solely in the role of a full time salesman.
“Mr. Ted Dunham’s version of these negotiations between himself and the defendant is- substantially the same as that of Mr. Stephens except as regards the 5‡ per ton royalty. Mr. Dunham contends that during the period of negotiations no mention whatever was made of this royalty for the reason that Stephens was so heavily indebted that he was in no position to bargain. Mr. Dunham contends that it was only after the transaction had been completed and he had paid off all of the debts of the LaSalle Material Company, Inc., and received the controlling % of its stock that any mention was made of the royalty in question. Dunham contends that after the transaction had been completed he authorized the payment of this per ton royalty to Stephens simply as a gratuity to help him out financially.
“The testimony of Mr. Ted Dunham is in direct contradiction to that of Mr. O. R. Stephens as to the question of whether this royalty constituted any portion of the consideration agreed upon during the negotiations, and we must therefore look to the record for corroboration of the statement of one or the other to determine the facts for the purpose of deciding this case. Corroborating the testimony of Mr. O. R. Stephens, we find that there is filed in the record the deposition of Mr. M. T. Covington who was employed by Mr. Ted Dunham as an auditor during the period of these negotiations. Mr. Covington testified that he came to Alexandria with Mr. Dunham for the purpose of auditing the books of the *225 LaSalle Materials Company, Inc., for Mr. Dunham and during one of the meetings held between Dunham and Stephens, Mr. Dunham made the statement “I want Steve to have this royalty”. Mr. Dunham contends now that Mr. Covington is mistaken as to the time at which this statement was made, Dunham alleging that it was made at a meeting several months after June 26, 1950 on which date the transaction was completed. However, Mr. Covington testified that he was quite positive that he heard the royalty discussed during the negotiations before the transaction was completed and he particularly remembers it because he, at the time, told Mr. Stephens that he was in an enviable position for taxes because in surrendering the stock of LaSalle Materials Company, Inc. and getting back the royalty in question, he would have a very high cost basis for the royalty and would consequently have to pay very little income tax. Mr. Covington later wrote a letter to Mr. Stephens advising him in detail as to this tax saving, as shown by the copy of said letter which is attached to Mr. Covington’s deposition and marked 'Defendant No. 1’ for identification. Pursuant to this advice Mr. Stephens actually showed this royalty on his 1950 income tax return at a cost of $64,399.90.
“The testimony of the defendant regarding these negotiations is, of course, further corroborated by the fact that after the transaction was completed in June of 1950 the royalty was actually paid to him personally by a check from one of Mr. Dun-ham’s corporations for a period of approximately four years, averaging about the sum of $1,000 per month. It is certainly difficult for the Court to believe that Mr. Dunham would authorize the payment of this royalty for a period of four years simply as a gratuity to Stephens.
“The only evidence placed in the record to corroborate Mr. Dunham’s version of these negotiations is the testimony of Mr. George S. Covert who was, at the time, an employee of one of Mr. Dunham’s corporations. Mr. Covert stated that he was present during some of the meetings between Dunham and Stephens and that he did not recall any conversation relative to the royalty until after the stock transfer had been completed. This of course, is negative testimony and under the laws of evidence does not carry as much weight as the positive testimony of Mr. Covington that he did hear Mr. Dunham agree to let Stephens retain this 50 per ton royalty.
“For the reasons set forth the Court must accept Mr. Stephens’ version of the agreement between him and Mr. Dun-ham. The Court is of the opinion that during the negotiations it was agreed that Stephens would personally receive the 50 royalty as a part of the consideration for this transfer to Dunham of the controlling interest in LaSalle Materials Company, Inc.
*227 “Pursuant to these negotiations between Dunham and Stephens the entire transaction was completed on June 26, 1950 at which time Mr. Dunham paid off all of the obligations of LaSalle Materials Company, Inc. and at the same time the name of the corporation was changed to DunhamStephens Gravel Company, Inc. and Mr. Stephens surrendered all of the stock which was reissued as agreed upon, z/i to Mr. Dunham and his associates and % to Stephens.
“Then following this transaction and for the period of time from August, 1950 through October, 1952, the royalty payments, which are the subject matter of this litigation, instead of being paid to DunhamStephens Gravel Company, the record owner of the royalty, were paid directly to O. R. Stephens on the basis of 100 per ton. Mr. Stephens paid y¿ of these amounts, that is 50 per ton, to the land owner, Louisiana Development Company and he, Stephens, retained the other 50 per ton during this entire two year period of time.
“On October 30, 1952 for some reason not made clear in the record, a new arrangement was made regarding the original lease and the royalty payments. Whatever the reason for this new arrangement, it was obviously done pursuant to directions from Ted Dunham because all of the papers were drawn by his attorneys and were signed in the office of one of his corporations in Baton Rouge, Louisiana. On this date, October 30, 1952, Dunham-Stephens Gravel Company, Inc. as lessee, and Louisiana Development Company, Inc. as the land owner, entered into a cancellation of the original lease covering the quarry near Winnfield. At the same time and as part of the same transaction, Louisiana Development Company entered into a new lease with Anderson-Dunham Concrete Company, Inc., covering the same property and this lease provided for payment of a royalty of 50 per ton. Then at the same time, and as part of the same transaction Anderson-Dunham Concrete Company entered into an agreement with O. R. Stephens individually agreeing to pay him an over-riding royalty of 50 per ton.
“There was admittedly no resolution of the board of directors of Dunham-Stephens Gravel Company, Inc., authorizing the cancellation of the old lease, nor was there any resolution of the Board of Directors of Anderson-Dunham Concrete Company, Inc., authorizing the new lease or the over-riding royalty deed to Stephens.
“For the period of time from November, 1952 through March, 1954 over-riding royalty payments of 50 per ton were paid by Anderson-Dunham Concrete Company, Inc. to O. R. Stephens individually, as shown by the list of payments marked Plaintiff No. 7, filed in evidence.
“By the early part of the year 1954, Dun-ham-Stephens Gravel Company, Inc., was again heavily in debt and Mr. Ted Dunham *229 met with O. R. Stephens and his attorneys in the City of Alexandria in an attempt to get Stephens to personally assume part of the corporation indebtedness. Stephens refused and immediately after that on instructions from Mr. Dunham, the Anderson-Dunham Concrete Company, Inc. stopped making over-riding royalty payments to Stephens. The testimony of Mr. Dunham as appears on page 27 of the transcription of the testimony reads as follows:
“ ‘Q. Now, shortly after that and after Mr. Stephens had refused to assume any of these obligations personally, you instructed the Anderson-Dunham Concrete Company to stop these royalty payments, did you not ? A. After the lawyers and everybody went into this thing to see where this obligation might rest.
“ 'Q. Then your answer can qualify as yes. Is that correct ? A. Oh yes.
“ ‘Q. And the royalties have not been paid by Anderson-Dunham to Mr. Stephens, since that time? A. That’s right.’
“Shortly thereafter these two suits were filed and it is interesting to note that Mr. Dunham admits quite freely that all of these corporations filed these suits on his instructions and without any resolution of their boards of directors or authorization from any other officers.
“The stock ownership of the various corporations involved in this litigation as set forth in the stipulation of facts filed by plaintiffs and defendant shows that Ted Dunham, Sr. controls Anderson-Dunham Concrete Company, Inc. and DunhamStephens Gravel Company, Inc. As to the remaining corporations which are creditors of Dunham-Stephens Gravel Company, Inc., Mr. Ted Dunham, Sr. owns at least as much stock as any other single stock holder.
“Furthermore the record is replete with evidence which shows beyond a doubt that Dunham-Stephens Gravel Company, Inc. and Anderson-Dunham Concrete Company, Inc. were under the sole control of Ted Dunham and that the boards of directors of these two corporations took no part in any of the negotiations and considered the acts of Mr. Dunham to be the acts of the corporation.
“Plaintiffs contend that the payment of this 5^ per ton royalty to Mr. Stephens over a period of about four years was simply a gratuity by Dunham to Stephens. A large portion of the plaintiff’s brief is concerned with this argument. For the reasons set out above the Court has already reached the conclusion that this royalty was not a gratuity but was, as a matter of fact, one of the moving considerations of the transfer by Stephens to Dunham of the controlling interest in LaSalle Materials Company, Inc.
“Plaintiffs also contend that since there was no resolution of the board of directors of Dunham Stephens Gravel Company, Inc. *231 authorizing the payment of this royalty to Mr. Stephens, there is no act by which the corporation is bound. The plaintiff cites the case of Renauld v. Marine Specialty and Mill Supply Company, 172 La. 835, 135 So. 374 as authority for the proposition that a corporation can act only in accordance with its charter and in the manner provided by statute. A mere reading of the opinion will show that the Court found the facts in that case to be that the stock holders involved in the agreement in question were acting for themselves individually and did not even purport to be acting in the name of the corporation, and therefore the corporation was not a party to the agreement nor was it bound by the agreement.
“A general statement of the law with which we are concerned in this case may be found in 19 C.J.S. [Corporations § 1018] at page 495 where we find the following:
“ ‘Except where the ratification is required, under the rules stated in § 1017 supra, to be made in a particular manner, an implied ratification of the unauthorized acts of an officer or agent binds the corporation under the same conditions as would an express ratification. Generally, ratification may be implied from the acquiescence in, or recognition of, the act by the corporation, through its proper officer or agent, see infra § 1019, or from its accepting and retaining the benefits of the act, see infra § 1020, or from any other acts or conduct which reasonably tend to show an intention to adopt or affirm the act or contract, particularly where it appears that the corporation has repeatedly recognized and approved similar acts done by the officer or agent, provided at the time of such acts or conduct it has full knowledge of the material facts, in accordance with the requirements indicated in § 1015 supra; and where the unauthorized act or contract is clearly beneficial to the corporation, a ratification may be implied from slight circumstances/
“Also see 19 C.J.S. [Corporations § 1019] page 497 which reads as follows:
“ ‘In accordance with the rules which govern ratification by acquiescence in other cases of agency, mere silence or delay on the part of the corporation in repudiating an unauthorized act of its officer or agent does not necessarily amount to a ratification of such act, although it is always an element to be considered in connection with other evidence tending to show a ratification; and, unless the doctrine of ultra vires applies, as a general rule, if the corporation, through the officer or body having authority to act acquires or is charged with knowledge of the unauthorized act and does not repudiate it within a reasonable time, but without objection acquiesces therein, it will be held to have ratified the act, unless there is a sufficient excuse for the delay or failure to repudiate.
“ ‘This general rule particularly applies where the delay has been for a long period of time, or where the silence or acquies *233 cence is accompanied by acts indicating an approval or recognition of the unauthorized act, as where the corporation receives and retains the benefits of, or exercises acts of dominion over the subject matter of, the unauthorized act, where the circumstances are such as to impose upon the corporation a duty to act promptly, as where loss or injury to the other party is likely to result on its failure to do so. Thus, where the president executes a contract which requires the concurrence of the board of directors, and the board, knowing that he has done so, does not dissent within a reasonable time, it will be presumed to have ratified the act. Where, however, the corporation promptly expresses its disapproval of the unauthorized act, any delay in asserting its rights will not be deemed as a ratification.’
“A recent Louisiana case which states the jurisprudence of this State on the subject is that of Acadian Products Corporation [of Louisiana] v. Savananna Corporation, 222 La. 617, 63 So.2d 141 :
“ ‘It is the universally accepted and recognized rule that contracts entered into or other transactions engaged in without authorization from the governing authorities of a corporation may be ratified either expressly or by implication by those having the authority, provided the action was not prohibited by the corporation’s charter, by statute, or is not contrary to public policy. Vol. 2 Fletcher’s Cyclopedia of Corporations 765, Sections 750-785; 3 Thompson on Corporations (3rd ed.) 738, Sections 2105-2170 ; 7 R.C.L. 662, Sections 663-668; 14A C.J. 373 Section 2232, etc.; 19 C.J.S. Corporations § 1014; 13 Am.Jur. 927, Section 972; 7 A.L.R. 1446. The law and jurisprudence of this state are to the same effect. Articles 438, 439, 1840, 3000, and 3010 of the LSA-Civil Code; Bezou v. Pike, Lapeyre & Brother, 23 La.Ann. 788; Robinson Mineral Spring Co. v. DeBautte, 50 La.Ann. 1281, 23 So. 865; Perchmann v. Mt. Eagle Construction Co., 128 La. 894, 55 So. 567; J. D. Pace & Co. v. Alexandria Electric Rys. Co., 138 La. 879, 70 So. 867; Hibernia Bank & Trust Co. v. Dresser, 145 La. 133, 81 So. 875; Administrators of Tulane Educational Fund v. B. G. Carbajal, Inc., 180 La. 355, 156 So. 416; and Morgan v. Cedar Grove Ice Co. [215] La. 741, 41 So.2d 521. Such ratification is retroactive in effect and equivalent to prior authority. Grove v. Harvey, 12 Rob. 221; Dord v. Bonnaffee & Co., 6 La.Ann. 563. See, also, Vol. 2 Fletcher’s Cyclopedia of Corporations 539; Section 618, page 851, Section 777; 3 Thompson on Corporations (3rd ed.) 740, Section 2106; 1 C.J. 983, Section 88; 13 Am.Jr. 928, Section 973; and the articles at 5 Louisiana Law Review 308 and 100 University of Pennsylvania Law Review 649.’
“In the case of Tremont Lumber Company v. Lacas, La.App., 62 So.2d 665, the Court in discussing the situation where a *235 saw mill superintendent entered into a lease on behalf of the corporation, although he was not authorized to do so and then the corporation permitted the lease to be carried in effect for eight months without objection, had this to say:
“ ‘Finally, it is argued plaintiff failed to prove that any officer of the corporation was authorized to enter into a lease agreement with company employees. The contention is unsound. Defendant admitted that he had possession of the premises over a period of months and permitted deductions from his pay. This fact alone suffices as ratification, if any be required, of the action of the company’s superintendent who placed defendant in possession of the premises.’
“In the case at bar it is the opinion of the Court that the act of Ted Dunham in authorizing these royalty payments to Mr. Stephens was in effect the act of the corporation Dunh'am-Stephens Gravel Company because Mr. Dunham owned a controlling interest in the stock and the board of directors never took any part to and apparently considered that the act of Ted Dunham was the act of the corporation. In any event, the acts of Mr. Ted Dunham in this regard were certainly ratified by the corporation when they stood by for a period of about four years without protesting and allowed these royalty payments to be made to Stephens. The corporate action in making these royalty payments was one of the strongest methods of corporate ratification. See 13 American Jurisprudence, page 981, et seq.
“However, Stephens does not have to rely on the oral agreement of Mr. Dunham or the ratification by the DunhamStephens Gravel Company, Inc., because there was a novation when the old lease was cancelled and a new one made to Anderson-Dunham Concrete Company which corporation gave to Stephens a formal royalty deed, a copy of which is marked ‘Plaintiff No. 5’ and filed in evidence. This royalty deed is in valid form and according to its provisions is for an adequate consideration. It is interesting to note that Anderson-Dunham Concrete Company, Inc. which is the grantor in this royalty deed, is not a party to this litigation which is being brought by third parties not privy to said royalty deed.
“In their brief plaintiffs cite LSA-R.S. 12:27 which is concerned with illegal dividends or disposition of assets of a corporation by its directors or share holders. It is obvious that this royalty could not in any way be considered a dividend. It was a lawful, valid contract entered into first between Ted Dunham and O. R. Stephens and was a moving part of the consideration for their agreement. The agreement regarding the royalty was ratified by the corporation by actual monthly payments *237 being made. Subsequently there was a novation and a formal written instrument conveying this royalty to Stephens and this royalty deed was also ratified by the acquiescence of Dunham-Stephens Gravel Company, Inc. in standing by and allowing monthly payments to be made for a period of over two years. Throughout all of these transactions it is apparent from the record that there was no question but that the acts of Ted Dunham were the acts of the corporations and did not, as a matter of fact, need any ratification by the board of directors.”
For the reasons assigned, the judgment is affirmed at appellants’ cost.