**MEDALLION TOWER, INC., Plaintiff,**

v.

**FORT LAUDERDALE TECHNICAL COLLEGE, INC., Defendant.**

**Civ. A. No. 68–2061.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Oct. 5, 1970.

Lucas J. Giordano, Mmahat, Gagliano & Duffy, Metairie, La., for plaintiff.

Leon Sarpy, Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for defendant.

E. Clay Shaw, Jr., Fort Lauderdale, Fla., for Fort Lauderdale Technical College, Inc.

CASSIBRY, District Judge.

This cause came on for trial and the court, having heard the evidence and considered the stipulation of the parties, finds the facts and states the conclusions of law as follows:

## FINDINGS OF FACT

1.

At all material times the plaintiff, Medallion Tower, Inc., (Medallion or plaintiff) was a Louisiana partnership composed of the individual partners, John A. Mmahat and Paul F. Dastugue, Jr., and domiciled in the Parish of Jefferson, Louisiana.

2.

At all material times Fort Lauderdale Technical College, Inc., (Fort Lauderdale or defendant) was a Florida corporation.

3.

At all material times plaintiff owned the Medallion Tower Building which is situated at the corner of Camp and Natchez Streets in the City of New Orleans.

4.

The lease on which this suit is based was entered into on June 27, 1967 with John A. Mmahat signing the lease for Medallion, lessor, James J. Holmes signing for Louisiana Technical College, Inc., (Louisiana), lessee, James J. Holmes signing for Fort Lauderdale, surety, and James J. Holmes signing individually as surety.

5.

The lease was for the entire sixth floor of the Medallion Tower Building and was for a term commencing on lessee's occupancy, lessee to take possession July 15, 1967 or as soon thereafter as the premises were ready for occupancy, but no later than August 15, 1967 and ending on the 14th day of July, 1977 at a monthly rent of $1,333.33 per month. The lease further provided that the failure of lessee to pay any monthly installment of rent when due would mature all rent for the remainder of the term and bind the defendant to pay 8 percent annual interest on all rent due and to pay attorney's fees of 10 percent of the rent and interest due if it became necessary for plaintiff to enforce the lease judicially.

6.

The term of the lease in fact began on the 15th day of July, 1967 upon occupancy as provided in the lease and the lease was defaulted on June 15, 1968 and by virtue of the acceleration clause all the rents due from June 15, 1968 through the balance of the term of the lease together with interest and attorney's fees became due and owing.

7.

The rent on the lease was paid only up to June 15, 1968 thereby leaving the period from June 15, 1968 to July 15, 1977, a period of 109 months, unpaid under the terms of the lease.

**8.**

After the acceleration of the rents due under the terms of the lease, plaintiff, in mitigation of damages, leased the space from time to time and obtained payments of $8,866.00 which amount will be credited against the total amount of the judgment.

**9.**

James J. Holmes, at all material times up to September 21, 1967 was the President, and Lester S. Cotherman was Secretary-Treasurer, Chairman of the Board of Directors and Managing Director of Fort Lauderdale.

**10.**

Fort Lauderdale operated a computer school based in the State of Florida and in the early part of 1967 decided that it would explore the feasibility of expanding its operation into New Orleans, Louisiana. To that end the Florida corporation sent Holmes to New Orleans in March of 1967 for the purpose of determining the feasibility of a computer school in New Orleans. Cotherman also made several trips to New Orleans to help determine whether to expand its operations into Louisiana, prior to and after signing the lease.

**11.**

Fort Lauderdale officials were at all times aware that Holmes was in New Orleans for the purpose of beginning a computer school for the benefit of the Florida corporation and in connection with the beginning of the computer school was expected to lease premises in the City of New Orleans for the purpose of housing the Louisiana computer school.

**12.**

Cotherman was in frequent contact with Holmes during his activities in New Orleans in 1967, and was aware of his negotiations and activities in connection with the lease.

**13.**

From the inception of the lease, Cotherman knew of the signing of the lease and of the fact that Holmes had signed the lease on behalf of Fort Lauderdale as surety.

**14.**

By the written terms of the lease, Fort Lauderdale was purportedly made party to the contract of lease and bound itself in solido with the lessee.

**15.**

Fort Lauderdale had a direct pecuniary and business interest in the lease.

**16.**

In spite of knowledge of the lease from its inception, and knowledge that it was a party thereto, Fort Lauderdale did not attempt to repudiate the lease until September 21, 1967. This was approximately the same date that defendant corporation disassociated itself from Holmes; that its Board of Directors ceased to be Directors of Louisiana, and that the stock ownership, which heretofore had been under the control of the defendant, vested in Holmes.

**17.**

Pursuant to the lease and before its attempted repudiation, the plaintiff expended a large sum of money to prepare the premises for the occupancy of lessee.

**18.**

The defendant corporation after the beginning of the lease, and before its attempted repudiation of the lease, leased from third parties computer equipment for placement on the premises of the Louisiana computer school in the Medallion Tower.

**19.**

Defendant, through a related corporation, Future Funds, Inc., financed five or six student loans at the Louisiana

computer school after the inception of the lease.

20.

During the period of the lease negotiations and past the time of the signing of the lease the salary of Holmes was being paid by the defendant as was the salary of Cotherman, as well as various expenses connected with the presence of Holmes and Cotherman in New Orleans for the purpose of starting the Louisiana school.

21.

Defendant advanced the funds with which the Louisiana school began its operation.

22.

Cotherman had contacted John G. Weinmann, a New Orleans attorney, prior to the lease negotiations and requested that he, Weinmann, incorporate Louisiana with the same directors as the defendant, indicating to Weinmann that ownership of the stock would be determined at a later date.

23.

The formation of the Louisiana corporation by Weinmann was not completed until after the signing of the lease, and Cotherman on behalf of the defendant wrote to Weinmann on June 27, 1967 requesting that the Louisiana corporation be capitalized for $5,000.00 and that the directors be the same as the directors of the Florida corporation.

24.

Louisiana began its corporate existence on June 29, 1967.

25.

Plaintiff was represented in the lease negotiations principally by Mmahat, who, in his negotiation of this lease, understood that Weinmann was representing the Florida corporation as well as the Louisiana school and was under the impression that Holmes was representing the defendant as well as the Louisiana school and further, Mmahat made inquiries in the business community with respect to Holmes as President of the Florida corporation and was satisfied that Holmes did occupy that position and further Mmahat made inquiries in the business community with respect to the financial condition of defendant and was satisfied that defendant was a responsible business.

26.

Weinmann negotiated and drafted the final lease in his office.

27.

On June 12, 1968 Edward C. Carroll on behalf of the defendant paid the rent for the months of April and May of 1968 on the leased premises.

28.

On June 26, 1968 the defendant through its then attorney, Harry Herman, paid the rent due on the lease for the month of June, 1968, up to June 15, 1968.

29.

Weinmann, in his representation in connection with the negotiation of the lease, was representing the interests of the defendant as well as the Louisiana school.

30.

The terms of the lease provided for two sureties, Holmes, personally, and Fort Lauderdale, but the lease further provided that Holmes, individually, would cease to have any obligations to lessor under the contract of lease in the event and at the time he ceased to be an employee of Fort Lauderdale. In fact, Holmes did cease to be an employee of Fort Lauderdale on or about September 21, 1967 and therefore at all times after September 21, 1967 the defendant was the only Surety on the lease.

## CONCLUSIONS OF LAW

### 1.

This court has jurisdiction over this matter by virtue of diversity of citizenship between plaintiff and defendant and because the matter in controversy exceeds the sum of $10,000.00 exclusive of interest and costs. 28 U.S.C. § 1332(a).

### 2.

Holmes bound the defendant on the lease.

A. Holmes had actual express authority to bind the defendant in that he was sent to Louisiana for the express purpose of beginning the Louisiana school. Leasing of premises in which to conduct the school was essential to carrying out this mandate. An actual express agency may be created either by oral or written agreement. See Busby v. Walker, La.App., 84 So.2d 304; Nalle v. Higginbotham, 21 La.Ann. 477; Cf. 23 Tulane L. Rev. 242. Although there was no resolution of the Board of Directors authorizing Holmes' activities, these activities were under the express direction of Cotherman, who, as managing director of the defendant was entrusted with the general management of the business of the corporation. As such, his directions were those of the corporation. An officer of a private corporation may legally be clothed with the powers and authority of a general manager. He may be entrusted with the entire management of the business and affairs of the corporation and, when such is done, his acts are virtually the acts of the corporation itself. Fletcher on Corporations, vol. 3, p. 3202; 19 C.J.S. Corporations § 756 p. 99; Southern Hide Co. v. Best, 174 La. 748, 141 So. 449 (1932). Also see Russ v. United Farm, 230 La. 889, 89 So.2d 380; City Savings Bank and Trust Co. v. Shreveport Brick Co., Inc., 172 La.

471, 134 So. 397. Furthermore, provisions of the charter and by-laws authorized Holmes to make and sign the contracts of the corporation.

B. Holmes had apparent authority to bind the defendant because he was held out and permitted to appear as having such authority. As president he was the proper party to sign a lease. Additionally, the defendant arranged for its local attorney to draw up and approve the lease. It is well settled that the true measure of an agent's authority is that which his principal holds him out as having. George A. Broas Co. v. Hibernia Homestead, La.App., 134 So.2d 356.

C. The defendant is estopped from denying its liability under the lease because it had knowledge of the lease from its inception on or about June 27, 1967 but failed to repudiate it until September 21, 1967, during which time plaintiff, in good faith, acted under the lease to its detriment. Where a corporation by its acts or conduct knowingly causes or permits a person to act as its agent, either generally or for a particular purpose, it will be estopped to deny such agency or authority to the injury of a third person who, in good faith and in the exercise of reasonable prudence, deals with such agent on the faith of such appearances. 19 C.J.S. Corporations § 1011, p. 481.

D. The defendant ratified the lease by acting in such a manner as to indicate acquiescence in it and by accepting benefits under it. Ratification, as applied to the law of agency, is the adoption or affirmance by a principal of the acts of his agent, either expressly, as by a written act, or impliedly as by acceptance of the benefits of the contract. A corporation may not, any more than an individual, reap the benefits of a contract and thereaf-

ter deny its obligations arising thereunder. See Dunham-Pugh Co. v. Stephens, 234 La. 218, 99 So.2d 88; Skye Realty Co. v. Diversified Insurance Agency, Inc., La.App., 221 So.2d 871, 19 C.J.S. Corporations § 1018, p. 495. The defendant not only failed to repudiate the lease timely but procured the lease of machinery and equipment which it had installed on the leased premises. The defendant accepted benefits under the lease by retaining control of the ultimate stock ownership of the Louisiana corporation. It is significant that the defendant's purported repudiation of the lease was more or less simultaneous with its disposition of control of stock ownership.

E. The authority under which Holmes acted was valid even though it was not given in writing. Generally a power of attorney to execute a contract of suretyship must be in writing to be valid, because the contract of suretyship is required to be in writing. La.Civil Code Art. 2278(3). However, in the instant case, the defendant was activated by a pecuniary and business motive of its own and bound itself in solido with the principal debtor. Under such circumstances its obligation was an independent and principal obligation, although in the form of a suretyship contract, and as such comes under an exception to the strict requirement that it be in writing. Therefore it follows that the power of attorney did not have to be in writing. B. & B. System v. Everett, 34 So.2d 521, 522 (La.App.2d Cir. 1948); Fuselier v. Hudson, 93 So.2d 266, 267 (La.App. 1st Cir. 1957); Watson Brothers v. Jones, 125 La. 249, 51 So. 187 (1910); Continental Casualty Co. v. Associated Pipe & Supply Co., 279 F.Supp. 490, 504 (E.D.La.1967).

### 3.

The act of the defendant corporation in signing as surety is not an ultra-vires act. A prohibition in a corporate charter against conducting a surety business does not prohibit the corporation from entering into a contract of suretyship which is incidental to or in furtherance of its business. Also, as has been indicated above, in Conclusion 2(E), this is essentially an independent and principal obligation although it is in the form of a suretyship contract.

### 4.

The plea of division under La. Civil Code Arts. 3049, 3050 is not available to the defendant. By the terms of the lease defendant is the only surety and has been since September 21, 1967. Also, defendant having bound itself in solido and assumed an independent obligation would not in any event be entitled to the plea of division.

### 5.

Under the acceleration clause of the lease, the rent for the 109 months which remained under the term of the lease as of June 15, 1968 became due and owing the plaintiff, together with interest of 8 percent per annum on the accelerated amount from June 15, 1968, until paid, together with attorney fees of ten percent of the principal and interest due all as provided in the lease, and all subject to a credit of $8,866.00 which amount was received by plaintiff after June 15, 1968.

It is so ordered, and counsel for plaintiff will submit appropriate judgment.