467 So.2d 1229 (1985)
Dr. F.E. McCARTY, Appellant,
v.
Sonny PANZICO d/b/a Panzico's Garden, Appellee.
No. 16852-CA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1985.
*1230 Hudson, Potts & Bernstein by Lee Perkins, Monroe, for appellant.
Blackwell, Chambliss, Hobbs & Henry by James A. Hobbs, West Monroe, for appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
Plaintiff, Dr. F.E. McCarty, appeals the judgment of the trial court in favor of defendant, Sonny Panzico, d/b/a Panzico's Garden Mart, in plaintiff's suit on an open account. We affirm the judgment of the trial court for the following reasons.
This appeal arises from the formation and operation of a corporation, Growers Supply, Inc., in which both the plaintiff and the defendant were incorporators and shareholders.
The record establishes that Growers Supply, Inc. was incorporated on June 1, 1976. The corporation was formed as a wholesale garden and lawn supply business. The incorporators of the corporation were Paul Wilhite, plaintiff and the defendant. The named directors of the corporation were the plaintiff, defendant, Paul Wilhite and Gary Mitchell.
The Articles of Incorporation provided in pertinent part that the authorized capital stock of the corporation was 10,000 shares, without nominal or par value, to be paid for in cash or in property for such amounts as the Board of Directors of the corporation would determine. The stock was to be fully paid and nonassessable when issued and no transfer of stock was to be binding on the corporation unless it was made in accordance with the Articles of Incorporation and by-laws and was recorded on the corporate books. The Articles of Incorporation further provided that the stockholders could make an agreement, either in the by-laws or by shareholders' agreement, as to the purchase of stock among the shareholders or by the corporation itself.
At the first organizational meeting of the Board of Directors, Wilhite was named as the President of the corporation and defendant was named as the Vice-President and Secretary-Treasurer. Shares in the corporation were issued for the consideration of $3.50 per share payable in cash as follows:

Paul Wilhite 1,500
Gary Mitchell 1,500
Robert "Sonny" Panzico 1,500
Dr. Frellsen McCarty 5,500

A resolution authorizing Wilhite as President to conduct and transact the routine business activities of the corporation and to act for and in the name of the corporation in entering into contracts, leases, purchases, sales and other transactions in the normal course of the corporation's business was unanimously adopted.
A shareholders' agreement was entered into by the shareholders which provided in pertinent part that in the event a stockholder wished to sell all or a portion of his stock, he must make a written offer to the corporation at a price to be determined by a valuation of the stock by the shareholders at their annual meeting, commencing with the annual meeting in 1977, or at a price established by the agreement of all the shareholders at any time during the year. The corporation would have thirty days within which to elect to purchase the offered stock. If unable to lawfully purchase all of the shares, the corporation was *1231 to notify the remaining shareholders who would have the option to purchase the stock before it could be offered to other outside purchasers.
By agreement of the shareholders, the value of the stock was fixed at $3.50 per share as of the date the shareholders' agreement was executed.
On December 15, 1976, Gary Mitchell resigned as a director of the corporation. On that date, an act of consent was executed by the remaining shareholders whereby the preferential rights of purchase on behalf of the corporation and shareholders provided in the shareholders' agreement were waived. 1,000 of Mitchell's 1,500 shares were sold to defendant and the remaining 500 shares were sold to plaintiff at a price of $3.50 per share, without regard to the delays specified in the shareholders' agreement.
The minutes reflect that at the annual meeting of the shareholders on June 30, 1977, Wilhite, plaintiff and defendant were re-elected as directors. Further, Wilhite was re-elected as President of the corporation and defendant was re-elected as Vice-President and Secretary-Treasurer. By unanimous resolution, all actions of the officers and directors from the date of incorporation until December 31, 1976 were ratified and the value of the corporate shares was fixed at $3.50 per share, said price to remain in force until a subsequent re-valuation.
The records of the stock certificates reflect the following transactions. Shares were issued on June 1, 1976 as follows:

Certificate # 1 Wilhite1,500 shares
Certificate # 2 Mitchell1,500 shares
Certificate # 3 Panzico1,500 shares
Certificate # 4 McCarty5,500 shares

Mitchell's certificate # 2 is marked "cancelled" and on December 15, 1976, new certificates were issued as follows:

Certificate # 5 Panzico1,000 shares
Certificate # 6 McCarty500 shares

Plaintiff's certificates # 4 and # 6 were also cancelled and on April 28, 1977, stock was reissued as follows:

Certificate # 7 Wilhite500 shares
Certificate # 8 Wilhite500 shares
Certificate # 9 McCarty5,000 shares

It appears that as of April 28, 1977, after the above described transfers, the stock in the corporation was owned as follows:

Panzico  2,500 shares
McCarty  5,000 shares
Wilhite  2,500 shares

No other stock transactions are contained in the corporate records.
From the record, it appears that the corporation acted informally from the date of its inception. Wilhite essentially acted as the manager of the business and plaintiff remained generally in the background, providing financial backing for the corporation. Defendant acted as a salesman for the corporation, traveling several days a week. Apparently, it was planned that Mitchell would terminate his regular employment and work for Growers Supply, Inc. beginning in early 1977. However, in December 1976, Mitchell changed his mind and surrendered his stock to the corporation.
During this time, defendant also had his own business and made purchases for this business from Growers Supply, Inc. Defendant maintained three separate accounts with the corporation; a "regular" open account, a "future order" account for orders of seasonal merchandise for future delivery and billing and a consignment account by which corporate merchandise was placed with defendant for sale, to be paid for only after it was sold.
Sometime in 1977 and 1978, defendant sought to withdraw from the corporation and approached Wilhite about this on several occasions. On May 31, 1978, defendant allegedly surrendered his stock as partial payment on his various accounts. On that date, defendant owed the corporation $2,365.70 on the regular account, $14,670.14 on the future order account and a zero balance on the consigned account. Defendant paid the balance on these accounts, less the $8,750.00 which was the agreed value of the defendant's stock. *1232 From that date, defendant continued to make purchases from the corporation but never attended any corporate meetings nor received any billing of a previous account balance.
The minutes of the annual meetings of the Board of Directors held on July 31, 1978 and on June 30, 1979 reflect that defendant was absent. In both meetings, Wilhite was re-elected as President, defendant was re-elected as Vice-President and Secretary-Treasurer and plaintiff was elected as Assistant Secretary-Treasurer.
The annual federal income tax returns of the corporation filed for 1977 and 1978 reflect that 85% of the corporate stock was owned by plaintiff with the remaining 15% owned by Wilhite.
A special meeting of the Board of Directors was held on November 5, 1979, which Panzico did not attend. The meeting was called for the purpose of considering whether to place the corporation in bankruptcy as the financial condition of the corporation had greatly deteriorated after the June annual meeting. A resolution that the corporation file for bankruptcy was unanimously adopted. The corporation was later adjudicated bankrupt.
On September 2, 1980, plaintiff purchased all of the accounts receivable of the corporation for $250.00 from the bankruptcy trustee, Herschel Gentry. On November 20, 1980, plaintiff instituted this suit on an open account alleging that defendant owed $14,670.14, representing purchases of merchandise from November, 1977 to April, 1978, and that on June 5, 1978, defendant paid Growers Supply, Inc. the sum of $5,920.14, leaving a balance due of $8,750.00.
At the trial on the merits, Herschel Gentry, the bankruptcy trustee, testified that defendant's consigned account, as reflected by ledger sheets, had a zero balance as of July 27, 1977 and there was an undated transfer of $8,750.00 to that account from the future order account. The ledger reflects that $8,750.00 was transferred from the future order account on December 5, 1978 but the ledger does not reflect to which account this amount was transferred.
Paul Wilhite, former President of the corporation, testified that Panzico had discussed leaving the corporation with him on several occasions and wanted the corporation to purchase his shares as it had done with Mitchell's shares. Wilhite testified he informed Panzico that the shares were purchased by shareholders, not by the corporation and that neither he or the corporation were financially able to purchase the shares. Wilhite testified he was agreeable to the stock surrender proposed by defendant but he told defendant he would have to talk to the plaintiff. Wilhite testified that the balance of defendant's future order account was $14,670.14 from which he deducted $8,750.00, which represented the value of defendant's stock. Defendant then wrote a check for the difference. Wilhite stated that from that point, Panzico was not connected with the corporation but continued to make purchases for his retail business. Wilhite's testimony as to whether the debt was considered cancelled was somewhat conflicting. However, Wilhite testified that he personally considered the account to have been paid after defendant's payment of $5,920.14 on May 31, 1978. Wilhite testified that at the time of these discussions with defendant, the corporate financial standing was "very bad" and there was no money to purchase stock, either from surplus or capital.
Wilhite testified that plaintiff had attempted to speak to defendant about the account prior to the time of the corporation's bankruptcy and that defendant continued to receive notices of the Board of Directors meetings. Wilhite also testified that the federal income tax returns of the corporation were prepared from information supplied by him and the plaintiff and from use of the corporate records.
Defendant, Sonny Panzico, testified he desired to leave the corporation to devote his efforts to his own business and approached Wilhite about surrendering his stock. Defendant denied that Wilhite had stated that the corporation was financially *1233 unable to purchase his stock. Defendant testified that Wilhite had stated that plaintiff was aware of the proposed transaction. After issuing the checks in payment of the various accounts, defendant testified he never received any billings for the alleged amount due until the corporation went into bankruptcy nor did he receive notice of corporate meetings. Defendant considered the debt to be cancelled from the date of payment. Defendant testified that he did not recall ever purchasing any of Mitchell's stock and stated that he had paid $8,750.00 for his original shares but was never issued any stock certificates.
Plaintiff, Dr. F.E. McCarty, testified he first became aware of the account balance when examining corporate records prior to filing bankruptcy sometime in 1980 but that when contacted, defendant refused to discuss it. McCarty testified that there was never a shareholders meeting concerning the redemption of defendant's stock or an agreement by him to purchase the stock. McCarty stated that the defendant's certificates were never cancelled. McCarty testified that the stock in the corporation did have some value in 1978.
Julian Johnston, an accountant for the corporation, testified that the financial condition of the corporation was poor from its inception and the corporation never had any surplus or paid in capital. Johnston prepared the tax returns and testified that the information supplied by the corporation reflected that the shareholders in 1978 and 1979 were Wilhite with 15% of the shares and plaintiff with the remaining 85%.
The trial court found that if the corporation, its officers and shareholders had strictly followed the charter, by-laws, shareholders' agreement and applicable statutes, the stock transaction could not have been legally accomplished. The corporation never had any surplus from which to purchase treasury stock nor was there literal compliance with the shareholders' agreement upon Mitchell's and defendant's "surrender" of their shares. Further, Wilhite's authority as President to conduct "routine" business would not ordinarily be construed to authorize "ex-parte" stock transactions with the shareholders.
However, the court found the evidence indicated that after incorporation, the corporation operated informally with Wilhite making the decisions and plaintiff remaining in the background, permitting such activity. The court found that in his discussions with the defendant, Wilhite was acting for the corporation and had the authority in law to cancel stock in partial payment of an account. The court further found that Wilhite intended to accept surrender of the stock in payment of the account. The records, except for the belated, undated transfer of $8,750.00 from one account to another, and the actions of plaintiff and Wilhite are consistent with that intent.
The court noted that more than two years elapsed before plaintiff made any demand for payment on the defendant after the continuing decline of the business. Wilhite never made any demand for payment on the defendant nor was there any billing by the corporation for a past-due balance on the alleged delinquent account despite defendant's continuing contacts with the corporation.
The court concluded that the $8,750.00 sued for was liquidated by the surrender and cancellation of defendant's stock by the mutual agreement and actions of all the shareholders.[1]
On appeal, the primary issue before this court is whether the trial court erred in finding that the defendant's stock was surrendered to the corporation, thus resulting in payment of the account.
It is well-settled that an "appellate court cannot disturb the trial judge's reasonable evaluations of credibility and reasonable inferences of fact.... The trial judge's findings as to the credibility of *1234 witnesses and his findings of fact cannot be disturbed unless clearly wrong." Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir.1983) at 1121, writ denied 443 So.2d 586 (La.1983) and numerous citations therein. The "... reviewing court must give great weight to the conclusions of the trier of fact, and should not disturb reasonable evaluations of credibility and reasonable inferences of fact, even though other evaluations and inferences are as reasonable." Aleman v. Lionel F. Favret Co., Inc., 349 So.2d 262 at 264 (La.1977).
Plaintiff essentially argues that defendant could not surrender his stock in payment of his account because Wilhite, as President of the corporation, did not have the authority to approve of such a transaction nor did the actions of Wilhite and the other directors ratify the alleged cancellation of the debt. Further, the redemption of shares was in violation of LSA-R.S. 12:55, as the corporation was insolvent and in violation of the corporate charter, by-laws and shareholders' agreement.
It appears from the evidence that Wilhite's grant of authority by the corporation to conduct and transact the routine business activities of the corporation would not normally extend to the acceptance of surrendered stock as partial payment of an account. Further, the doctrine of apparent authority does not appear to apply in the instant case.
The doctrine of apparent authority was created to protect parties dealing in good faith with corporate officials when the corporation has taken such action or inaction so as to justify a belief that the official has acted with authority. See Lilliedahl & Mitchel v. Avoyelles Trust & Sav., 352 So.2d 781 (La.App. 3rd Cir.1977). The two requirements for imposition of the doctrine are that the principal must make some form of manifestation to an innocent third party and the third party must reasonably rely on the agent's purported authority as a result of the principal's manifestations. Lilliedahl & Mitchel v. Avoyelles Trust & Sav., supra. It is implicit that this doctrine was created to protect innocent third parties in their dealings with a corporation and would not extend to protect a shareholder/officer/director who is familiar with the operation of the corporation.
However, it is clear from the evidence that the surrender of the defendant's stock was implicitly ratified by the corporation.
The recognized rule is "... that contracts entered into or other transactions engaged in without authorization from the governing authorities of a corporation may be ratified either expressly or by implication by those having authority, provided the action was not prohibited by the corporation's charter, by statute, or is not contrary to public policy." Acadian Production Corp. v. Savanna Corp., 222 La. 617, 63 So.2d 141 at 143 (1953) and numerous citations therein. See also Dunham-Pugh Company v. Stephens, 234 La. 218, 99 So.2d 88 (1958).
In examining Louisiana law and jurisprudence, the court in 3 A's Towing Co. v. P & A Well Service, Inc., 642 F.2d 756 at 758-759 (5th Cir.1981), noted that
[T]he general rule that a ratification occurs when personnel with the authority to bind the corporation acquire knowledge of the unauthorized act and thereafter fail to repudiate it within a reasonable period of time is particularly applicable where the delay in repudiating is a long one, where the failure to repudiate is accompanied by acts indicating approval of the unauthorized actsuch as receiving and retaining the benefits accruing from itor where the circumstances call for a quick repudiation. There is no requirement that some measurable benefit inure to the corporate principal from the unauthorized act.
Further, ratification has retroactive effect and is equivalent to prior authority. 3 A's Towing Co. v. P & A Well Service, Inc., supra.
In examining the elements of ratification, it is quite clear that the surrender of stock by a shareholder in partial payment *1235 of a debt owed to the corporation is not void as against public policy.
Plaintiff argues that the surrender of shares was in violation of state law as the corporation was insolvent at the time of the transfer.
LSA-R.S. 12:55 provides in pertinent part:
A. A corporation shall not purchase or redeem its shares when it is insolvent, or when such purchase or redemption would render it insolvent, or at a price, in the case of shares subject to redemption, exceeding the redemption price thereof, or when its net assets are less than, or such purchase or redemption would reduce its net assets below, the aggregate amount payable on liquidation upon any issued shares, which have a preferential right to participate in the assets in event of liquidation, remaining after the purchase or redemption and cancellation of any shares in connection therewith....
Insolvency is defined in LSA-R.S. 12:1.L. as "... the inability of a corporation to pay its debts as they become due in the usual course of business."
The testimony at trial indicated that the financial condition of the corporation was poor from its inception, necessitating increased borrowing of funds throughout the life of the corporation. Financial reports of the corporation indicated that the corporation operated at a loss. However, it does not appear that the corporation was insolvent at the time defendant's shares were surrendered within the meaning of the statute. Growers Supply, Inc. continued to operate for quite some time after the surrender in 1978 before eventually filing for bankruptcy. While operation of the corporation was at a financial loss and necessitated the borrowing of funds, there was no evidence that the corporation was unable to pay its debts as they became due at the time of the surrender.
Plaintiff argues that the surrender and cancellation of defendant's stock was in violation of Growers Supply Inc.'s corporate charter as Wilhite did not have the authority as President to permit the transaction and it was not done in compliance with the shareholders' agreement. Assuming that the corporate charter would include the shareholders' agreement as well as the by-laws, it does not appear that the surrender of stock would constitute a violation of the corporate charter.
As noted previously, the shareholders of the corporation had entered into a shareholders' agreement as to sale and purchase of stock. While the procedure specified in the shareholders' agreement was not followed in this instance nor did Wilhite have the authority to accept the surrender of stock, it is clear that the surrender of stock did not substantively violate any provisions of the corporate charter but rather was in the nature of a procedural violation. In other words, the purchase of stock by the corporation was not a prohibited act under the provisions of the corporate charter. The shareholders' agreement specifically authorized the corporation to purchase stock from a shareholder. To interpret this element of ratification as requiring a substantive violation of the corporate charter is consistent with the purpose of this doctrine. Otherwise, any "unauthorized act" would technically violate the corporate charter and thus preclude the finding that the act had been ratified. The evidence, although somewhat conflicting, clearly supports the finding that the corporation tacitly ratified the surrender of defendant's stock.
After the surrender in the early summer of 1978, defendant never attended any corporate functions nor was he billed for any delinquency. Defendant continued to deal extensively with the corporation, making purchases for his own business until the corporation's bankruptcy. Defendant was not listed as a shareholder on the corporate income tax returns which were prepared from information supplied by the corporation. A period of several years passed before any demand for payment was made on the defendant, clearly a very lengthy delay in this small, closely-held corporation. Although the testimony is conflicting, *1236 it appears that the trial court was not clearly wrong in finding that plaintiff did have some knowledge of this transaction and seemingly acquiesced in it before taking action shortly prior to bankruptcy proceedings. Furthermore, this type of transaction had been previously permitted when Mitchell surrendered his stock without full compliance with the procedure outlined in the shareholders' agreement.
For these reasons, the judgment of the trial court in favor of defendant, Sonny Panzico, d/b/a Panzico's Garden Mart, and against plaintiff, Dr. F.E. McCarty, is affirmed at plaintiff's costs.
AFFIRMED.
NOTES
[1] The trial court noted that although Panzico testified he was not aware of being allocated any of Mitchell's shares and that he paid $8,750.00 for his original shares, it would take both defendant's original 1,500 shares plus Mitchell's 1,000 shares to equal $8,750.00 at $3.50 per share, which was the only valuation of the stock in evidence.