**In re MANVILLE FOREST PRODUCTS CORPORATION, Debtor.**

**GULF STATES EXPLORATION CO., Plaintiff,**

v.

**MANVILLE FOREST PRODUCTS CORPORATION, Defendant.**

**GULF STATES EXPLORATION CO., Plaintiff–Appellant,**

v.

**MANVILLE FOREST PRODUCTS CORPORATION, Defendant–Appellee.**

No. 88 Civ. 6650 (MBM).
Adv. No. 85–5911A.

United States District Court,
S.D. New York.

May 8, 1989.

Frederick W. Bradley, Liskow & Lewis, New Orleans, La., Lansing R. Palmer, New York City, for plaintiff-appellant.

C.A. Martin III, Shotwell, Brown & Sperry, Monroe, La., Marc Abrams, Levin & Weintraub & Crames, New York City, for defendant-appellee.

## OPINION AND ORDER

MUKASEY, District Judge.

Gulf States Exploration Co. ("Gulf") appeals a decision in bankruptcy court (Lifland, *C.J.*,) expunging its proof of claim against Manville Forest Products Corp. ("Manville"), now in Chapter 11 bankruptcy, for breach of an oil and gas exploration agreement. This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a). Gulf contends that the bankruptcy court incorrectly applied Louisiana law to this contract and should have allowed Gulf to assert the rights of its working interest partners.[1] For the reasons set forth below, the bankruptcy court's decision is affirmed.

---

1. Gulf, however, does not appeal from Judge Lifland's decision limiting its proof of claim to the amount originally filed—$16,035,000—rather than the amount in Gulf's subsequent complaint—$31,009,837.

## I.

As the facts of this case are detailed extensively in Chief Judge Lifland's thorough opinion reported at 89 B.R. 358 (Bankr.S.D.N.Y.1988), I need present only a thumbnail sketch of the facts pertinent to this appeal. Prior to Manville's Chapter 11 filing, Manville and Gulf entered into a hydrocarbon exploration agreement. Pursuant to that agreement Gulf drilled four wells on Manville's property. Gulf then sought to have Manville grant it drilling rights in a geological formation on Manville's property named the Wilcox Formation ("Wilcox"), which Gulf alleged was included in the exploration agreement. Manville refused to grant the request.

Appellant Gulf, a Texas corporation, is an oil and gas exploration company wholly owned by Gulf States Oil and Refining Company. J.C. Ogden, a geologist, was its chief operating officer. He was assisted by Barbara Price, a "landman"—the person in charge of evaluating and administering leases. Manville, a wholly owned subsidiary of Manville Corporation, owns substantial land and mineral rights in Louisiana. Donald R. Worden was its Exploration and Minerals Manager and, after May 1, 1982, became Director of Energy Resources. Worden has express written authority to bind Manville on contracts and leases for up to 1000 acres. Manville's President John D. Mullens gave Worden this limited authority, which was filed in the public records of Grant Parish, Louisiana.

In October 1980, Ogden approached and negotiated with Worden to obtain rights to explore for, and develop, oil and gas on a particular area of Manville's property known as sections 410, Township 8 North, Range 3 West, Grant Parish, Louisiana. (the "area of interest") Ogden thought that two rock formations in the area of interest —the Mooringsport, a deep formation found at 9000 to 10,000 feet, and the Wilcox, a shallow formation at 1200 to 4400 feet—would produce oil. Worden had Manville's counsel draft an exploration agreement in October 1980 which Mullens signed on behalf of Manville. Although Manville owned approximately 3,360 acres in the area of interest, it did not own all of the mineral rights in that acreage. Manville owned 57.3507%, Donner Properties, Inc. ("Donner") 41.4752%, and the Whitney National Bank ("Whitney") 1.1741%. Accordingly, Worden sent the agreement to co-owner Donner who signed it and forwarded it to Gulf in November. The agreement explicitly excluded mineral rights to the Wilcox. Under the agreement, however, Gulf was required to "log" the Wilcox (i.e., graph it in order to scan for oil) each time it drilled through that formation to the deeper Mooringsport.

Ogden found the exploration agreement unacceptable because it excluded the Wilcox and because it limited leases to 160 acres. In January 1981, Worden agreed to include the Wilcox in the agreement. Accordingly, Price, acting for Gulf, added several proposed changes as interlineations to the agreement. One of the interlineations stated that the Wilcox formation was "to be included by separate agreement." (Exh. 7 at 1) Ogden signed the interlineated agreement for Gulf on January 2, 1981, but held it until he received assurances from Manville's Worden that a letter regarding the Wilcox was forthcoming. On February 11, Worden prepared, signed and mailed the letter including the Wilcox in the agreement. (the "Wilcox letter") Worden also initialled the interlineated agreement. Mullens did not sign the Wilcox letter, nor did he initial the changes on behalf of Manville. It is undisputed that Worden did not have express authority to sign either the interlineated agreement or the Wilcox letter, as both concerned land over 1000 acres.

In 1981, Gulf drilled four wells in the area of interest. Gulf's logs of the Wilcox formation, sent to Manville in accordance with the agreement, showed possible oil. In mid-May 1982, Worden showed them to Jim V. Haddox. Haddox requested a lease. In late May, he sent the logs to the Hogan Exploration Company ("Hogan"). After reviewing the logs, Hogan's President Robert F. Meredith contacted Worden on June 16 and also requested a lease. Worden agreed but told Meredith that Haddox had previously asked for it and that they should resolve the matter. Meredith and Haddox

settled on an arrangement and wrote to Worden on June 27, 1982 informing him of their agreement that Hogan acquire the lease. The written lease, however, was not executed until August 9, 1982.

In early August 1982, Ogden requested in behalf of Gulf a lease for the Wilcox. Worden refused because Manville already had granted the lease to Hogan. On August 6, 1982, Gulf recorded the agreement and the Wilcox letter in the public records of Grant Parish, Louisiana. Manville filed a petition for reorganization under Chapter 11 on August 26, 1982. Gulf filed a timely proof of claim seeking $16,035,000 in damages for Manville's alleged breach of contract. Prior to this, Gulf had assigned the balance of its interest in these leases to its four working interest partners, retaining only a 39.0625% interest. Of the five working interest partners, however, only Gulf filed a proof of claim in bankruptcy court. Its proof of claim does not state that it is appearing in any representative capacity.

## II.

The bankruptcy court determined that Louisiana did not recognize the apparent authority doctrine for contracts involving immovable property. Even if it did, the judge found that Worden did not have express or apparent authority to alter the exploration agreement and execute the Wilcox letter. The court also determined that Louisiana required that any ratification be in writing. Again, even if Louisiana law allowed a claim for implied ratification, the judge found that Manville's actions did not amount to implied ratification of the interlineations and the Wilcox letter. Assuming that the interlineated agreement and Wilcox letter were valid, he determined that, under the contract, Manville remained free to grant Wilcox leases until Gulf requested one. He found also that Manville had previously granted the lease to Hogan by oral agreement. He ruled that Manville thus did not breach the agreement with Gulf. Finally, he held that Gulf's failure to include the claims of the working interest partners in its proof of claim or to indicate in its proof of claim that it was representing their interests barred consideration of their claims. Gulf now appeals from each of these findings.

### A. *Scope of Review*

The bankruptcy court, by decision dated November 6, 1985, held that this claim constituted a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The judge also denied appellant's motion pursuant to 28 U.S.C. § 1412 for a transfer of venue. Those orders were affirmed by Judge John E. Sprizzo of this court on April 30, 1986. In reviewing core proceedings, the clearly erroneous standard for factual findings applies. Under this standard, the reviewing court is required to search the entire record, but may reverse the bankruptcy court only if it is "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Of course, any conclusions of law made by the trial judge are subject to plenary review by this court. *Matter of Missionary Baptist Foundation of America*, 712 F.2d 206, 209 (5th Cir. 1983). I now turn to consider each of appellant's contentions.

### B. *Worden's Apparent Authority*

▇▇ The bankruptcy court determined that Louisiana law does not recognize apparent authority in cases involving immovable property. He thus concluded that appellant could not advance its argument that Worden was clothed with apparent, albeit not express,[2] authority to bind Manville. In so ruling, he relied on a Louisiana appellate court decision. *Tedesco v. Gentry Dev., Inc.*, 521 So.2d 717, 720–23 (La.App. 2d Cir.1988). The Louisiana Supreme Court has recently affirmed that decision, explicitly holding that the doctrine of apparent authority is inapplicable to contracts involving immovable property. *Tedesco v.*

---

**2.** Appellant has abandoned any argument that Worden had express authority to enter into the transaction in question. (Brief of Defendant-

Appellee Manville Forest Products Corporation at 15)

*Gentry Dev., Inc.*, 540 So.2d 960, 965 (La. Sup.Ct.1989). That Court, however, left open the possibility that the doctrine of agency by estoppel would apply to such cases. As that Court's decision was issued after the bankruptcy court's opinion and after the parties had briefed this appeal, I asked the parties to submit letter briefs on this question.

As described by the Louisiana Supreme Court,

> "agency by estoppel is based on tort principles of preventing loss by an innocent person. The third person not only must show reliance on the conduct of the principal, but also must show a change of position on his part that it would be unjust to allow the principal to deny the agency."

At 965. Thus, under agency by estoppel, Gulf must show reasonable reliance by Gulf on some indication by Manville that Worden had authority, and a change of position by Gulf based on that reliance. In this regard, the bankruptcy judge made two findings which negate an estoppel here. First, he found that Gulf's reliance on Worden's apparent authority was "unwarranted and unreasonable." 89 B.R. at 368. Second, in determining whether Manville was estopped from advancing its defense that Worden lacked express authority, the judge below found no change in position on Gulf's part:

> [Gulf's] reliance argument, based on its alleged expenditure of funds which it claims it would not have spent but for its anticipated right to the Wilcox, is also unavailing. The evidence establishes that the sums were expended pursuant to the other provisions of the Exploration Agreement and not merely in anticipation of drilling into the Wilcox.

89 B.R. at 368. Those two findings are supported by the evidence. Accordingly, they preclude an agency by estoppel argument.

### C. *Manville's Ratification*

■ Appellant claims the bankruptcy court erred in asserting that Louisiana law requires that ratification of a contract for immovable property by an agent without authority be in writing. Two contradictory lines of Louisiana court decisions bear on this question. One line has distinguished contracts involving immovable property from those involving movable property. Those cases hold that implied ratification arguments may be raised only in movable property contract cases; for immovable property cases, written ratification is required. The other line of cases does not require that ratification of immovable property contracts be in writing, applying instead implied ratification doctrine to both movable and immovable property contracts. Because I find that the latter set of cases did not fully consider whether immovable property contracts should be treated differently from movable property contracts, but simply applied principles of implied ratification across the board, I agree with the judge below that the first line of cases represents Louisiana law and thus that any ratification by Manville must be in writing as the contract involves immovable property.

In support of his holding that only written ratification is proper for immovable property cases, the bankruptcy judge cited several Louisiana appellate court decisions and a federal court decision. *Fejta v. GAF Co., Inc.*, 800 F.2d 1395 (5th Cir.1986); *Tedesco*, 521 So.2d at 723–24; *Daigle & Assoc., Inc. v. Coleman*, 385 So.2d 349 (La.App. 1st Cir.1980), *aff'd on other grounds*, 396 So.2d 1270 (La.1981); *Krupp v. Nelson*, 50 So.2d 464 (La.App. 4th Cir.1951). *See also Morvant v. Arnoult*, 490 So.2d 549, 551 (La.App. 4th Cir.1986); *Sanders v. Rudd*, 427 So.2d 1271, 1275 (La.App. 2d Cir.1983). Appellant Gulf notes that this line of cases is not dispositive because the Louisiana Supreme Court, in affirming the appellate court's decision in *Daigle*, expressly refused to reach the question whether a contract for immovable property would require a writing ratifying authority. 396 So.2d at 1271. Thus, Gulf claims, the Louisiana Supreme Court has never endorsed this view. However, Justice Blanche's concurrence in *Daigle* explicitly stated that Louisiana law requires a writing for ratification of im-

movable property contracts. 396 So.2d at 1272.

Appellant Gulf relies on the second line of cases referred to above, beginning with a Louisiana Supreme Court decision, *Dunham–Pugh, Inc. v. Stephens*, 234 La. 218, 99 So.2d 88 (1958). Gulf argues that *Dunham–Pugh* stands for the principle that contracts involving immovable property may be ratified without a writing. However, the court in *Dunham–Pugh* noted that in that case there was a subsequent written ratification, so it did not actually reach the question of whether immovable property contracts, as opposed to movable property contracts, require written ratification. Indeed, the Louisiana Supreme Court merely reprinted the lower court's opinion containing the discussion of implied ratification, demonstrating that it did not fully consider the issue at all. Because *Dunham–Pugh* involved immovable property, however, it has been a source of some confusion. For example, in *Fear v. Calumet Indus., Inc.*, 350 So.2d 940, 943 (La. App. 2d Cir.1977), the court relied on *Dunham–Pugh* when it considered implied ratification of land subleases—clearly immovable property. That the *Fear* court did not consider whether immovable property contracts should be treated differently from movable property contracts is obvious by its citation to a case involving *movable* property, *Process Installation, Inc. v. Bio Chemical Research & Dev. Corp.*, 173 So. 2d 247, 249 (La.App. 1st Cir.1965) (architect plans), in support of its application of implied ratification to an *immovable* property contract. Thus, neither *Dunham–Pugh* nor *Fear* fully considered the issue whether contracts involving immovable property, as opposed to movable property, could be ratified without a writing. In the face of overwhelming precedent that such ratification requires a writing, and without evidence that any other state court reached the opposite result after full consideration of the issue, I am constrained to find that Louisiana law requires written ratification of contracts for immovable property. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

■ In any event, the court held that appellant had failed to make out a claim for implied ratification. Appellant argued below that Manville's grant of *320*–acre deep leases for areas other than Wilcox evinced Manville's ratification of the interlineated agreement because the original agreement signed by Mullens had limited deep leases to *160* acres, while the interlineated agreement provided for deep leases of up to *320* acres. Thus, appellant contends, Manville's grant of these 320–acre deep leases constituted ratification of the interlineated agreement and, along with it, the Wilcox letter. The court found Manville's grant of 320–acre deep leases ambiguous because Worden was authorized to grant leases of up to 1000 acres and could increase the size of the leases beyond the original agreement's limit of 160 acres. Thus, he reasoned, the increased acreage leases could be viewed as a legitimate extension of the original agreement, rather than as a sign that Manville intended to ratify the interlineated agreement. Moreover, because the original agreement explicitly *excluded* the Wilcox, the 320–acre leases, which were deep leases not involving the shallow Wilcox, could not amount to a ratification of the interlineated agreement that *included* the Wilcox. Appellant's claim of error here rests on its view that the original agreement and the interlineated agreement were not separate: indeed, appellant argues, the original agreement never even became an "agreement" because Ogden immediately objected to it. Thus, the only agreement was the interlineated agreement and, consequently, Manville's actions cannot be explained away by reference to an agreement which never existed. Although Gulf's Ogden and Price may not have intended that the original agreement be final, the fact that the original agreement explicitly excluded the Wilcox formation, while the interlineated agreement and the Wilcox letter included it, definitively shows that the agreements were separate. Nor does the fact that Gulf's Ogden objected to the original agreement change this calculus: rather, the inquiry is whether *Manville's* actions demonstrate that it intended to ratify

a contract giving Gulf the right to lease the Wilcox, rather than a contract which limited Gulf to drilling in the deeper Mooringsport formation. Thus, Chief Judge Lifland's factual findings reflect a proper understanding of the ratification inquiry and are consistent with the evidence presented to him.

■ Likewise, the court correctly rejected appellant's argument that Manville's receipt of royalties from the 320–acre leases shows acceptance of a benefit, traceable solely to the alleged contract and sufficient to trigger an estoppel. Those royalties derived from the deep Mooringsport leases and were authorized by the original agreement. As such, they are separate from any leases for the Wilcox, which could have been authorized only by the interlineated agreement and the Wilcox letter. The bankruptcy judge concluded that "[n]o royalties were paid by [Gulf] to Manville on any Wilcox production." 89 Bankr. at 371.

■ Finally, appellant argues that the entry of the exploration agreement in Manville's list of executory contracts provided to the bankruptcy court on February 9, 1983 represents a written ratification. First, the list was filed after the agreement expired by its own terms on February 1, 1983. *Morvant*, 490 So.2d at 551 ("Although a principal can subsequently ratify an act of his agent, such ratification cannot take place where ... the agreement by its very terms expired prior to the ratification"). Second, even if the list was drafted before February 1, 1983, it refers to a contract date of "October 1, 1980" which is the date of the original agreement, not the date of the Wilcox letter. (Exh. 125) Thus, this list dovetails with Manville's view that the only agreement was the original one. Although appellant notes that Manville's files contained a copy of the interlineated agreement, the list is still ambiguous. Accordingly, I agree with the judge below that this writing is insufficient to show intent to ratify the interlineated agreement and the Wilcox letter.

### D. *Interpretation of the Contract*

■ Even if the Wilcox letter was enforceable, either because it was ratified or because Manville is estopped from denying Worden's authority, the bankruptcy judge found that Manville did not breach its terms by leasing the Wilcox to Hogan. He found, based on the agreement's terms as well as parol evidence, that Manville remained free to grant Wilcox leases to third parties until Gulf requested a lease. The Wilcox letter states that:

> in the event that you drill a well or wells upon the property covered by said Exploration Agreement or upon property unitized with said property and log the Wilcox Formation then upon your written request and receipt of a copy of said log, we will grant to you without the payment of any consideration a separate lease upon ... all our unleased and uncommitted mineral interests in the governmental quarter section upon which the well in question which has been drilled by you is located.

(Exh. 17) Although it is admittedly unclear whether the term "unleased and uncommitted" refers to mineral rights unleased at the time of the Wilcox letter or at the time Gulf requests a lease, the judge considered parol evidence and concluded that the contract permitted Manville to grant the Wilcox rights to a third party so long as there had been no such prior request by Gulf. The judge relied on several pieces of evidence: the testimony of Bill Oliver, a Donner official; Gulf's failure to inquire as to which properties were unleased and uncommitted at the time it signed the interlineated agreement; and the fact that, when Donner informed Gulf in October 1982 that it had secured a lease, Gulf did not protest this interpretation. Appellant claims that Donner is not a neutral party and, accordingly, Oliver's testimony should be discredited. The judge below was in the best position to assess Oliver's credibility, and I see no reason to disturb his finding. As for Gulf's failure to inquire whether the Wilcox was leased at the time it signed the interlineated agreement, appellant claims that there was no need to "run out and check to see whether Manville had leased

any Wilcox rights as of [February 1981]. It had or it had not. If it had, then there was nothing else Gulf States could do about it." (Brief of Plaintiff–Appellant Gulf States Exploration Co. at 42) I find this argument unconvincing. If Gulf thought it was contracting for a right to all unleased land as of the date of contract, it had a compelling interest to check on exactly which of Manville's lands were unleased at that time. If it found leases, there was certainly something it could do: it could refuse to sign the agreement, which obligated it, *inter alia*, to drill continuously in all areas and log the Wilcox formation. As for Gulf's failure to object to Donner's October 1982 letter, Gulf claims that, by October, it had already decided to sue Manville and, accordingly, it was not necessary to respond to Donner. This argument is reasonable. Nevertheless, considering the other two pieces of evidence which point strongly toward the interpretation of the agreement adopted by the judge below, I find his conclusion correct.

■ Appellant questions, however, whether the Wilcox formation was, in fact, transferred to Hogan before Gulf's request for a lease. The bankruptcy judge found that Hogan and Manville had entered into an oral commitment in June 1982, even though the lease was not reduced to writing until August 9, 1982, after Gulf's formal request. He noted that all parties to the agreement, as well as Haddox, testified that an oral agreement was concluded in June. Citing La.Civ.Code Ann. Art. 2275 (West 1973) (current version at Art. 1832 & 1839), the judge noted that Louisiana law recognizes an exception from the writing requirement for immovable property when the oral sale is confessed by the party against whom it is to be enforced:

> Every transfer of immovable property must be in writing; but if a verbal sale, or other disposition of such property, be made, it shall be good against the vendor, as well as against the vendee, who confesses it when interrogated on oath, provided actual delivery has been made of the immovable property thus sold.

Appellant claims this exception is inapplicable against third parties. In an analogous area—the writing requirement for authority to enter into a contract for immovable property on behalf of another—Louisiana law deems oral grants of authority "voidable by a party to the act, although not subject to attack by a third party." *Morvant*, 490 So.2d at 551 (549); *East Bank Realty, Inc. v. Robert*, 411 So.2d 500 (La. App. 1st Cir.1982); *Marchand v. Armstrong*, 354 So.2d 581 (La.App. 1st Cir. 1977). This is so because the writing requirement makes a transaction merely voidable, not "an absolute nullity" such that a third party could attack it. *East Bank Realty*, 411 So.2d at 502. Appellant also questions whether there was "actual delivery" here. Louisiana law recognizes the impossibility of actually delivering "immovable property." In *Duhon v. Dugas*, 407 So.2d 1334, 1338 (La.App. 3d Cir.1981), the court defined "actual delivery" to mean that the immovable property had been "placed into the *power* and possession of the . . . buyer. She was free to do whatever she wanted with it." (emphasis added) The date of the sale was deemed the date of actual delivery. Similarly here, the bankruptcy judge found that an oral agreement with Hogan had been reached in June; thus, actual delivery occurred then. The oral sale is sufficient to establish a lease valid against Gulf's later request for a lease.

\* \* \* \* \* \*

The only remaining issue is Gulf's claim that the bankruptcy court erred in holding that Gulf could not assert the claims of its working interest partners in this matter. Because I have found against Gulf on the merits, I need not reach this issue. The bankruptcy court's decision is affirmed.

SO ORDERED.