134 So.2d 356 (1961)
GEORGE A. BROAS CO., Inc.
v.
HIBERNIA HOMESTEAD & SAVINGS ASSOCIATION.
No. 127.
Court of Appeal of Louisiana, Fourth Circuit.
November 6, 1961.
*357 Darden & Screen, Carole A. Breithoff, New Orleans, for plaintiff and appellant.
Browne & Rault, Gerard A. Rault, New Orleans, for defendant and appellee, and third-party plaintiff and appellant.
Stone, Pigman & Benjamin, Ewell P. Walther, Jr., New Orleans, for third-party defendant and appellee.
Before McBRIDE and REGAN and JANVIER, JJ.
REGAN, Judge.
Plaintiff, the George A. Broas Co., Inc., a corporation organized for the purpose of developing real estate, instituted this suit against the defendant, the Hibernia Homestead & Savings Association, endeavoring to recover the sum of $24,499.86, representing the damages plaintiff alleged it incurred as the result of defendant's breach of contract, wherein defendant, through its former president, Albert Emke, committed itself to furnish interim and permanent financing to veterans who purchased homes in a subdivision developed by plaintiff.
Defendant answered and denied the existence of the contract, and in the alternative, pleaded that if such a commitment existed, the homestead president was without authority to make the commitment, and this fact was well known to the plaintiff.
Then, assuming the position of third party plaintiff, the homestead asserted that if it were cast in judgment, then Albert Emke, third party defendant, was liable for the amount thereof, since the commitment, if in fact it was ever made, was unauthorized by the board of directors and was therefore an ultra vires act for which the third party defendant is liable.
From a judgment dismissing both the principal demand and the third party action, the plaintiff has prosecuted this appeal. Defendant has also appealed the dismissal of the third party action so as to preserve its claim against the third party defendant in the event that the plaintiff should prevail in this court.
This case was consolidated with a similar suit, arising out of a parallel transaction, in order to facilitate and expedite the trial thereof. The suit referred to is entitled Adele Corporation v. Hibernia Homestead & Savings Association, 134 So.2d 362. In that case, plaintiff sued to recover $27,030.68, representing damages it asserted it had incurred as the result of *358 the homestead's unwarranted revocation of a commitment to finance purchasers of homes in plaintiff's subdivision.
George A. Broas is president of both plaintiff corporations.[1] The homes that were built by both plaintiffs are contained in one subdivision, located in Algiers and designated as Ellen Park. While the evidence adduced in the record concerns the negotiations between both of the plaintiff corporations and the defendant, for the purpose of preserving the simplicity and continuity hereof, we shall hereinafter relate the pertinent facts involving George A. Broas, Co., Inc., the plaintiff in this case.
In August, 1955, Broas began negotiations to purchase the property upon which plaintiff subsequently developed Ellen Park Subdivision. Learning of this proposed venture, defendant's president, Albert Emke, solicited the financing thereof for the Hibernia Homestead. Both Broas and Emke related that the plaintiff agreed to borrow $222,200 as interim financing for the purpose of developing the subdivision and Emke, in turn, guaranteed to plaintiff that it would furnish permanent financing to any qualified applicant who bought a home in Ellen Park.
In conformity with this agreement, plaintiff obligated itself to direct all individual purchasers to the defendant for financing, unless the individual desired to finance his home through another lending agency.
Broas and Emke explained that this agreement was mutually profitable. The contractor was assured that all qualified purchasers could secure financing and the homestead, in turn, developed a source for many individual loans. According to Broas and Emke, a real estate developer is in a position to recommend the homestead he favors to prospective purchasers, most of whom have no commitment or contract with another lending institution.
Pursuant to this verbal agreement, Emke, in his capacity as defendant's president, issued what was asserted to be a confirmation thereof by virtue of a letter dated March 23, 1956.[2]
On April 2, 1956, plaintiff purchased the property and obtained a $222,200 loan from defendant, secured by a vendor's lien and mortgage on the tract.
Three months thereafter, the first group of homes was completed. Plaintiff then procured the services of Richard C. Fitzgerald, a real estate agent, to find purchasers therefor. In advertising the homes, Fitzgerald represented that financing could be arranged by the realtor. In the summer and early fall of that year, Fitzgerald brought ten prospective purchasers to the homestead, which ultimately made loans to these individuals.
Meanwhile, the Home Loan Bank of Little Rock, defendant's federal supervisory agency, initiated an investigation into its operations and as a result thereof, Emke was removed as president by defendant's board of directors. This was consummated at a meeting of the board held on October 30, 1956. At approximately the same time, the federal bank instructed the defendant to reject all future G.I. loans, which then yielded only 4½ interest. However, the defendant was advised to honor all firm commitments given before this order was issued.
In November, 1956, Fitzgerald brought several applicants to the defendant, whom *359 it is asserted were qualified and desired to obtain G.I. loans; however, the homestead rejected their applications and denied it was committed to extend such loans.
The plaintiff, as a result thereof, was forced to seek financing elsewhere. To obtain it, the plaintiff was required to pay large origination fees and bonuses because at that time money was "tight" and G.I. loans, from the lending agencies' standpoint, were undesirable. In addition, the plaintiff asserted that it was forced to expend additional sums for servicing and maintaining the unsold properties. Therefore, the plaintiff insists that the foregoing constitutes the measure of damages incurred by it in consequence of the defendant's unjustified revocation of a commitment to finance purchasers of homes in its subdivision. Hence this suit.
The trial judge dismissed both the main and third party demands, and expressed the opinion that the contract lacked mutuality.
The initial question posed for our consideration is whether there is merit in the defendant's contention that its president, Emke, did not possess authority to enter into this agreement and that the plaintiff's president, Broas, was fully aware of that lack of authority.
The evidence concerning this aspect of this case is both fascinating, and to say the least, very convincing relative to the result which we have agreed should be reached herein.
The record reveals that Emke's duties, as the defendant's president, consisted of soliciting business, screening all loan applicants, and finally presenting those applications he considered desirable to the board of directors. The board was then obligated to evaluate each application, and either authorize the extension of that loan or reject it. Of course, no loan could be extended without the final approval of the board of directors.
According to the defendant's minutes, Emke presented the plaintiff's application for an interim loan to the board at a meeting held on March 8, 1956, and eighteen directors were in attendance. Among those present was Adele Broas, who, in addition to being a director, was executive vice-president of the homestead. She was also the wife of plaintiff's president, George Broas, and the sister of defendant's president, Albert Emke.[3]
Nine directors testified that the minutes of that meeting were falsified because the plaintiff's loan application was never presented to the board. In fact, they stated, that its consummation was only disclosed by the federal investigation conducted the following fall. The majority were positive that they would remember this transaction had it been discussed since a $200,000 loan is unusually large and, in addition thereto, plaintiff's president, Broas, was intimately related to the president, Emke, and the executive vice-president, Adele Broas, of the homestead, who were also related to each other as brother and sister.
Their testimony established that the minutes of a previous meeting were never read at the following meeting, this necessary action having been dispensed with shortly after Emke assumed the office of president of the homestead in 1948. It further established that Emke prepared the minutes and dictated them to Broas' wife on the day after the meeting occurred.
This testimony was contradicted only by Emke and Ashton Peyrefitte, a director who retired shortly after Emke was requested to resign. They both asserted that the loan application was approved and that the board understood the homestead was committed to furnish permit financing to individual purchasers brought to it by the plaintiff.
Of the eighteen directors recorded in the minutes as present, only ten testified. Among those directors who failed to appear *360 was Adele Broas, conspicious by her absence because she obviously knew whether the loan application was in fact presented to and approved by the board, and in addition to this, knew whether the minutes which she and Emke prepared reflected an accurate account of what transpired at a meeting which was of immeasurable benefit to her husband and her two daughters who were the organizers of both plaintiff corporations.
From the foregoing resume, we can only conclude that the evidence abundantly preponderates to the effect that Emke did not present the Broas proposition to the defendant's board of directors for approval and any commitment that may have been given to the plaintiff by Emke constituted an ultra vires act.
This reasoning now necessitates an analysis of plaintiff's contention that Emke, nonetheless, had apparent authority to contract with the plaintiff.
We agree with the plaintiff's assertion to the effect that the president of a corporation is clothed with apparent authority to transact business on his firm's behalf; however, the defendant meets this contention by insisting that the plaintiff was fully aware of Emke's lack of authority.
In essence, the defendant asserts that the plaintiff was aware of the fact that the contract was never valid because it knew that the defendant had never approved thereof, and it is thereby vitiated by virtue of the rationale of the following codal provision, which reads:
LSA-C.C. Art. 1847"Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. From which definition are drawn the following rules:
* * * * * *
"9. If the artifice be practiced by a party to the contract, or by another with his knowledge or by his procurement, it vitiates the contract; * * *."
To determine whether collusion vitiates the contract before us, we must evaluate the evidence in conformity with the legislative criterion set forth in LSA-Civil Code Article 1848, which provides:
"Fraud, like every other allegation, must be proved by him who alleges it, but it may be proved by simple presumptions or by legal presumptions, as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence."
The jurisprudence interpretative of this article has consistently reasoned from the major premise that fraud, unlike other allegations in civil cases, must be proved by more than a mere preponderance of the evidence. Since the accusation is a grave one, the courts have required strict proof thereof. However, the inherent difficulty of establishing fraud by direct evidence has also been recognized juristically; therefore, the courts have reasoned that an inference of fraud may be drawn from the existence of highly suspicious conditions or events, in conformity with the rationale of Article 1848.
In applying these fundamental principles to the instant case, we are led to the inevitable conclusion that the plaintiff was fully aware of the fact that the homestead directorate never consented to Emke's execution of the contract. To conclude otherwise, we would be required to keep the judicial veil tightly drawn, but then we would find ourselves in the unenviable category of the proverbial three monkeys, "who saw no evil, heard no evil, spoke no evil".
To reiterate, for the purpose of emphasis, defendant has established that Emke's commitment was an ultra vires act, unapproved by the board of directors. It is also obvious *361 that the wife of plaintiff's president not only knew her husband's request for permanent financing was not approved by the board, but also that the minutes were falsified. In view of these circumstances, it is difficult to overcome the suspicion that Adele Broas' husband was ignorant of Emke's actions; this is especially true when we evaluate the fact that she did not appear to testify in order to refute this overwhelming evidence of collusion. When a key witness fails to testify, the rules of evidence require that we presume her testimony would be adverse to the party who should have called her, in the absence of some reasonable explanation as to why she failed to appear.[4]
Our conclusion is fully substantiated by the jurisprudence. Where a party has charged as fraudulent an action involving close relatives, either by marriage or blood, the courts have deemed the relationship, in itself, a highly suspicious circumstance. This is illustrated by the case of Todd v. Mule[5], in which a seizing creditor was prevented from executing upon a judgment obtained against Billie Mule, Jr., by an affidavit of his sister, in which she asserted ownership of the property to be seized. Billie Mule actually purchased the car; however, his sister asserted he acted as her agent when the seizing creditor ruled her into court to show cause why her affidavit should not be declared false and the seizure allowed.
According to the evidence, Billie Mule took a car owned by his sister and traded it in on a new one because he knew more about automobiles. She had given him an additional sum in cash, part of which he lost in a card game. Therefore, when Billie actually acquired the automobile, he gave the dealer the used car, and a check for $100, signed by Marie Mule, per Billie Mule and he executed a note for the balance, secured by a chattel mortgage. The court therein made this observation:
"In the present case, the facts and circumstances attending the purchase from Lirette Chevrolet Sales of the automobile in question are so suspicious that we are justified by the established jurisprudence of this state in holding that the burden of proof has been thereby shifted from the plaintiff and placed on the defendant to show that she really purchased the automobile in question and is the owner thereof, as she claims to be." [19 La.App. 230, 140 So. 52.]
Since she did appear and relate what the court considered to be a plausible explanation of the suspicious circumstances, it reasoned that she successfully carried the burden of proving freedom from fraud.
Here we are confronted with conditions and events emphatically more suspect than those in the Mule case and there exists no credible evidence to rebut the reasonable presumption that Broas was fully cognizant of Emke's ultra vires act, especially in view of the fact that Broas' wife was Emke's sister and executive vice president of the homestead who actually recorded the minutes of defendant's meetings.
Therefore, we are compelled to conclude that the plaintiff was, in fact, fully aware that the defendant never consented to the contract, and it was therefore stricken with nullity from its very inception.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] George A. Broas Co., Inc. and Adele Corporation were organized by Broas and his two daughters, whose mother is Mrs. Adele Broas, the executive vice-president of the defendant homestead.
[2] The pertinent part thereof reads as follows:

"As per our conversation of even date, this is to inform you that this Association will be pleased to finance loans to individual borrowers on the single one-story brick veneer dwellings situated in Ellen Park Subdivision upon the completion of these homes by you and final approval of the Veterans Administration and our Building Export, Mr. S. E. Hottinger, and subject to the usual rules and regulations of this Association."
[3] Also, see footnote 1.
[4] See Elba v. Thomas, La.App., 59 So. 2d 732; Greathouse v. Thomas, La.App., 15 So.2d 555; Duhe v. Williams, La.App., 199 So. 518; and Lannes v. Escousse, La.App., 179 So. 106.
[5] 19 La.App. 230, 140 So. 50.