WINDHORST, J.
In this appeal, appellants/defendants, Bruce Schexnayder and Mark Schexnayder, challenge a district court judgment nullifying a land donation based on fraud and awarding damages and attorney fees to appellees/plaintiffs, Succession of Thelma Carrick Schexnayder, through its executor, Elwood Schexnayder, Elwood Schexnayder, individually and Nancy Schexnayder. Having considered the evidence, testimony, pleadings and all other parts of the record, we affirm the trial court's judgment for the foregoing reasons.
Factual Background
This appeal involves the Succession of Thelma Carrick Schexnayder (hereinafter referred to as "Thelma" or the "mother"), who was married to Elwood L. Schexnayder (hereinafter referred to as "Elwood" or the father") (also collectively referred to the "parents") until her death. They were married for sixty-eight (68) years, and had five children, Douglas, Nancy, Bruce, Mark and Kevin. During their marriage, Thelma managed all of the couple's financial affairs, and was very careful in her financial decision making. In 1996, both Thelma and Elwood executed wills leaving their entire estate to the other upon death.
During Thelma's life, her mother donated to her several acres of land in Virginia. Beginning in 2008, Thelma's son, Mark, began asking his mother to donate the Virginia property to him. In 2009 and 2010, Thelma donated 2.0 acres and 4.4 acres, respectively, to Mark. A few years before Thelma's death, Bruce began urging his parents, Thelma and Elwood, to seek estate planning advice, but they did not heed his advice.
In late April 2012, Thelma suffered a debilitating stroke, after which she required extensive rehabilitation. She lived in a rehabilitation center for about a month, and during this time, she executed a power of attorney to Elwood dated May 6, 2012, authorizing him to manage her personal and medical affairs and to donate property. According to appellants, because of their mother's health issues, they were routinely urging their parents to consider divesture options so that their mother would be eligible for Medicare and/or Medicaid. Several emails between Thelma and Elwood's sons, Bruce, Mark and Douglas, indicate that they were determined to convince their parents to divest themselves of the Virginia property and to *998 obtain the Virginia property for themselves before their mother died.
In an email dated May 30, 2012 from Mark to Douglas, Mark summarized his conversation with Elwood about finances and stated as follows:
I did tell daddy we need to look at his [sic ] all his finances and see how much $$ they have and he agreed. I agree with you that he seems pliable over the phone but reality (in person) may be different. The POA for him was also discussed. I strongly made the point that momma is currently not capable of making good decisions, so we must go around her and get things in motion and/or done when possible. No more farting around. Stay tuned for more regarding the VA land as I discussed doing something with you and Bruce in that area. It may involve some $$ from you/Bruce for a survey, but well worth it. Just keep your powder dry for now.
My plan is to fly down in mid-July for a week session of getting stuff squared away and perhaps helping Nancy move in. I basically gave him six weeks notice to get his mind right. * * * I also called Nancy to warm her up to things and make herself available during that week.
Things are not in real motion yet, but the table is being set, so have patience, grasshopper.
In another email that same day to Bruce, Mark states "[t]he big issue may be getting them to transfer title to nearly all their property to a trust, but that is what has to be done to get the divestment ball rolling. I think daddy will go along, but momma would flatly refuse. I talked [to] daddy at length today and I think daddy realizes that momma cannot make rational decisions at this point, and he is willing to take some action without her approval."
On July 2, 2012, Mark arrived in Louisiana from Virginia with a prepared Deed of Gift, effecting a donation of all the remaining Virginia property owned by Thelma to him. Approximately two weeks before coming to Louisiana and before Thelma or Elwood had agreed to the donation, Mark signed the act of donation and had it notarized in Virginia. Mark prepared the act of donation for Thelma's signature but because of her condition, she was unable to sign. Mark testified that he put Thelma's name on the document because it was his understanding that the name of the property owner should be on the deed regardless of whether the owner signed it or the power of attorney signed it. He believed that if the power of attorney signed for her, a copy of the power of attorney should be attached to the deed.
Early on July 16, 2012, the morning the Deed of Gift was executed, Mark emailed Bruce that he could "have just about whatever piece you want, but it will be a lot easier if it is a deal between us." Later that morning, Mark phoned Bruce and told him to come to their parents' home as soon as possible because they had something to do, which was have Elwood sign the Deed of Gift, donating the remaining Virginia property to Mark, as well as two other documents.
That afternoon, at his parents' house, Bruce presented the three documents to Elwood in the following order: (1) a Health Care Power of Attorney; (2) a Deed of Gift, Division, Boundary Line Adjustment and Merger Agreement by Thelma to Thomas L. Mountcastle; and (3) the Deed of Gift and Merger Agreement at issue here. The testimony is inconsistent as to the conversations that occurred during the signing and who was present. The testimony of Elwood, Bruce and Mark confirms that no one informed Elwood as to what he was signing when he signed the Deed of Gift, effecting the donation of the Virginia property to Mark. Bruce testified that the *999 donation deed was folded over to the signature page when he gave Elwood the document to sign, thereby concealing the document title. During the signing, Elwood told Bruce he trusted him to do the right thing.
On May 10, 2013, appellees/plaintiffs (the Succession, Elwood and Nancy) filed suit against appellants/defendants (Bruce and Mark), seeking revocation of the donation deed and damages caused be defendants' fraudulent actions. This matter proceeded to a bench trial on October 29-30, 2015. The hearing to determine attorney's fees and costs was held on December 5, 2016. The trial judge rendered judgment in favor of appellees/plaintiffs as follows: (1) annulling the Deed of Gift and Merger Agreement and decreeing Thelma as the sole lawful owner of the Virginia property; (2) awarding appellees $5,000 for damages Thelma suffered due to the fraud; and (3) awarding appellees reasonable attorneys' fees, which were determined to be $100,000. This suspensive appeal followed.
Assignments of Error
Appellants assert the following assignments of error: (1) the trial court erred in finding appellants fraudulently induced Elwood to donate the Virginia property to Mark when he had the opportunity to read the act of donation; (2) the trial court committed manifest error in finding appellants committed fraud and awarding damages; (3) the trial court erred in failing to disqualify appellees' counsel because he allegedly advised the defendant, Bruce, on the property transfer to Mark; (4) the trial court erred in denying appellants' motion for directed verdict; and (5) the trial court erred in awarding $5,000 in damages when the transfer occurred two months before Thelma's death. Appellees/Cross-appellants assert that the trial court should have awarded mental anguish and distress damages to Elwood for the fraud perpetrated against him; and that the trial court should have awarded more than $5,000 in damages to Thelma.
Law and Analysis
According to La. C.C. art. 1948, "[c]onsent may be vitiated by error, fraud, or duress." La. C.C. art. 1953 provides that "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." While an exception to this provides that fraud does not vitiate consent if the truth could have been ascertained "without difficulty, inconvenience, or special skill," this exception does not apply where there is a relationship of confidence. A relationship of confidence exists when a person has reasonably induced the other party to rely on his or her assertions or representations. La. C.C. art. 1954. Where a party has charged as fraudulent an action involving close relatives, either by blood or marriage, the courts have deemed the relationship, in itself, a highly suspicious circumstance. Sanders Family, LLC No. 1 v. Sanders, 46,476 (La. App. 2 Cir. 12/14/11), 82 So.3d 434, citing Perot v. Perot, 46,431 (La. App. 2 Cir. 8/10/11), 71 So.3d 1123 ; George A. Broas Co. v. Hibernia Homestead & Sav. Ass'n., 134 So.2d 356 (La. App. 4 Cir. 1961). A trial court's determination of whether fraud occurred is a question of fact and is subject to the manifest error standard of review on appeal. Miralda v. Gonzalez, 14-888 (La. App. 4 Cir. 2/04/15), 160 So.3d 998.
Assignments of Error One, Two and Four
Appellants assert the trial court committed manifest error in finding that they fraudulently induced their father, Elwood, to donate Thelma's property to *1000 Mark because the record demonstrates that Elwood did not read the document he signed. Considering the record before us, we find the trial court was not manifestly erroneous in finding that Mark and Bruce fraudulently induced their father to execute the deed donating Thelma's property to Mark.
As determined by the trial court, the record contains a series of emails between primarily Bruce and Mark that, "when taken as a whole, show a clear and convincing pattern of wanting to obtain the Virginia property as soon as possible and prior to their mother's death by any means necessary." In a May 30, 2012 email to Bruce and Doug, Mark states: (1) "I agree with you that he [Elwood] seems pliable over the phone but reality (in person) may be different"; (2) "I strongly made the point that momma is currently not capable of making good decisions, so we must go around her and get things in motion and/or done when possible"; (3) "Stay tuned for more regarding the VA land as I discussed doing something with you and Bruce in that area;" and (4) "Things are not in real motion yet, but the table is being set, so have patience, grasshopper." Regardless of whether these statements are read as part of the entire email or separately, they support the trial court's conclusion that appellants were deceitful in obtaining the Virginia property from their parents.
Another May 30, 2012 email, this one from Bruce to Mark, supports the trial court's finding that appellants sought to obtain the property notwithstanding their parents' wishes. Bruce states "[t]he big issue may be getting them to transfer title to nearly all their property to a trust, but that is what has to be done to get the divestment ball rolling. I think daddy will go along, but momma would certainly flatly refuse." Also, as noted in his May 30, 2012 email, Mark traveled to Louisiana in July 2012 and brought with him a prepared Deed of Gift effecting a donation by his mother of all remaining Virginia property to him. Mark signed the Deed of Gift and had it notarized in Virginia. While under Tweedel v. Brasseaux, 433 So.2d 133 (La. 1983) it may be procedurally correct for Mark to sign the Deed of Gift accepting the donation in advance, his signature thereon before either parent had agreed to donate the Virginia property to him suggests that he intended to obtain the property regardless of their wishes. In Tweedel, the donors instructed the donees to sign in advance, and the acceptance was signed only one day before the donors signed the donation. Here, Mark prepared, signed and notarized the Deed of Gift when the donors had not agreed to the donation and had no knowledge of the donation.
Appellants' discussions as to the division of the property knowing their parents had not agreed to the donation further supports the trial court's finding that appellants planned to obtain the property regardless of their parents' wishes. At least some of these discussions occurred on the morning of the donation, July 16, 2012. Early that morning, Mark wrote to Bruce that he could "have just about whatever piece you want, but it will be a lot easier if it is a deal between us." Mark also stated, "[i]f daddy wants you to get something, I will abide by his wishes, so do not worry about that. I am more worried about how to handle Doug and giving him a piece." Later that morning, Mark phoned Bruce and told him to come to his parents' home as soon as possible because they had "something to do," i.e. , to obtain Elwood's signature on the Deed of Gift donating all the Virginia property to Mark, as well as two other documents. Bruce, who notarized the donation and is also an attorney, did not discuss the contents of the donation *1001 with Elwood when he presented the donation to him to sign. Mark did not discuss the donation with Elwood, despite that he was staying at his house. Indeed, while there is contradicting testimony as to who was present and what was said, the record shows that no one advised Elwood of the title of the donation document or that he was transferring the entirety of Thelma's Virginia property to Mark alone.
Appellants also contend that Bruce had no duty to tell Elwood what he was signing as he was only "acting as a Notary," and not as Elwood's attorney. We agree with the trial court's finding that this explanation is not "after-the-fact credible." Bruce advised another attorney that he could handle most of his father's estate planning needs. In addition, emails from Bruce to Mark show that Bruce did extensive research regarding possible options for their parents' estate planning, and regularly gave his father advice on how to manage his financial affairs. In a September 12, 2012 email, Mark tells Bruce "[a]s distasteful as you find it, you have to use emotions against emotions. Daddy is 90% emotion and 10% logic/thought. Tell him you are bound by attorney-client privilege, so whatever you hear must stay secret if he wants it to."
Appellants further contend that a donation cannot be fraudulent if the donee had the means, opportunity and ability to review the donation document before signing it, but does not. They rely on La. C.C. art. 1954, which provides that a party's failure to ascertain the truth does not preclude vitiation of consent if the parties are in a relationship of confidence with each other. The trial court concluded that because there was a relationship of confidence between Elwood and his two sons, Mark and Bruce, Elwood's failure to read the document is not fatal to the succession's fraud claim. We agree with this conclusion.
The record shows that appellants fostered a relationship of confidence with their father by regularly giving him advice, researching financial planning for him and repeated urgings to set up estate planning. This relationship was confirmed by Elwood's statement, after signing the documents, that he trusted them to do what was right. Despite this, appellants did not inform their father that one of the documents being presented was a donation of all the Virginia property to Mark, or that Mark, Bruce and Doug had already agreed how they would divide it up among themselves. Mark and Bruce took advantage of their father knowing that he could be easily influenced by whomever happens to be standing there at the time." If the brothers intended to be veracious with their father, they would have advised him as to what he was signing. Appellants choose to have their father sign the document without him knowing its effect or content.
In light of the foregoing, we find no error in the trial court's conclusion.
Assignment of Error Three
Appellants assert that the trial court erred in refusing to disqualify appellees' counsel, Steven Griffith, Sr. According to appellants' motion to disqualify, they contacted Mr. Griffith and discussed the proposed transfer of the Virginia property. Based on the record, we find no error in the trial court's denial of appellants' motion to disqualify Mr. Griffith as appellees' counsel.
The Rules of Professional Conduct provide that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." There is a concurrent conflict of interest if "the representation of one client will be directly adverse to another client;" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to *1002 another client, a former client or a third person or by a personal interest of the lawyer." La. St. Bar Ass'n Art. XVI 1.7.
Appellants filed a motion to disqualify plaintiffs' counsel on July 25, 2013, but did not have it set if for a hearing until more than two years later, right before trial, on September 22, 2015. This suggests that appellants did not have a strong objection to Mr. Griffith's representation of appellees' or a substantial need to obtain testimony from him during discovery. In addition, the record indicates that appellants only briefly consulted with Mr. Griffith regarding the transfer of the Virginia property. In addition, appellants presented no persuasive evidence in support of their assertion, including no affidavits or testimony. There is nothing in the record which shows that a conflict of interest requiring the disqualification of appellees' counsel existed. Further, the delay in having the court address the motion, as well as moving to have it heard right before trial, suggests that appellants were not genuinely concerned about the existence of a conflict.
Considering the foregoing, we find that Mr. Griffith's representation of appellees did not involve a conflict of interest. This assignment of error lacks merit.
Assignment of Error Five/Appellee's Cross-Appeal
Appellants assert that the $5,000 award of general damages to Thelma is not warranted. The abuse of discretion standard of review applies to an appellate court's review of a factfinder's general damage award. Wainwright v. Fontenot, 00-492 (La. 10/17/00), 774 So.2d 70.
La. C.C. art. 1958 provides that "[t]he party against whom rescission is granted because of fraud is liable for damages and attorney fees." Based on the record, we cannot say the trial court abused its discretion in awarding $5,000 for Thelma's damages. There was testimony that Thelma was extremely upset about the donation. The record reflects that the property had been donated to Thelma by her mother, had been in the family for many years and obviously had deep sentimental value to Thelma. We do not find the trial court's award to be excessive.
In a cross-appeal, appellees claim that the trial court should have awarded damages to Elwood. On this claim, we also cannot say the trial court abused its discretion. At trial, there was limited testimony regarding damages. In addition, while Mark and Bruce took actions contrary to their parents' wishes and without their consent, it does not appear that they were attempting to leave them penniless. We therefore decline to award any additional damages.
Conclusion
For the reasons discussed above, we affirm the trial court's judgment.
AFFIRMED